Merle THORPE, Jr., by the Executor of his estate, Peter M. CASTLEMAN, and Foundation for Middle East Peace, a District of Columbia Corporation, Plaintiffs Below, Appellants,

v.

CERBCO, INC., Robert W. Erikson and George Wm. Erikson, Defendants Below, Appellees.

No. 345, 1995.

Supreme Court of Delaware.

Submitted: January 18, 1996.
Decided: April 10, 1996.
Rehearing Denied May 10, 1996.

Lawrence C. Ashby (argued), Stephen E. Jenkins and Richard D. Heins, Ashby & Geddes, Wilmington, and Joseph M. Hassett, George H. Mernick, III and Albert W. Turnbull, Hogan & Hartson, L.L.P., of counsel, Washington, DC, for Appellants.

Vernon R. Proctor, Bayard, Handelman & Murdoch, Wilmington, for Appellee CERB-CO, Inc.

Michael Hanrahan (argued), Elizabeth M. McGeever and April Caso Ishak, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for Appellees Robert W. Erikson and George Wm. Erikson.

Before WALSH, HARTNETT, and BERGER, JJ.

**WALSH, Justice:**

In this appeal from the Court of Chancery we address the duties owed to a corporation by controlling shareholders who are also directors. The shareholder-plaintiff in this derivative suit, Merle Thorpe[1] ("Thorpe") alleged that the controlling shareholders of CERBCO, Inc. had usurped an opportunity which belonged to the corporation. That opportunity was the potential sale of control of one of CERBCO's subsidiaries. The Chancellor held that the defendants, George and Robert Erikson ("the Eriksons"), who were directors, officers and controlling shareholders of CERBCO, breached their duty of loyalty by failing to make complete disclosure to CERBCO of this corporate opportunity and by not removing themselves from consideration of the matter. The court concluded however that, as controlling shareholders, the Eriksons had the right under 8 *Del.C.* § 271 to veto any transaction which CERBCO would have entered into which constituted the sale of all or substantially all of the assets of the corporation. Thus, according to the Chancellor, the Eriksons' conduct caused no injury to CERBCO.

We agree with the Court of Chancery that the Eriksons breached their duty of loyalty, and we acknowledge their entitlement as shareholders to act in their self-interest under section 271. Since the exercise of this self-interest meant, as a practical matter, that they would not allow CERBCO to take advantage of the opportunity itself, damages based on the noncompletion of an INA–CERBCO transaction are not cognizable. We conclude, however, that the Eriksons' conceded breach of their fiduciary duty renders them liable to disgorge any benefits emanating from, and providing compensation for any damages attributable to, that breach. Accordingly, the decision of the Court of Chancery is reversed in part and remanded.

I.

The Court of Chancery made detailed factual findings in this case. We accept

1. Merle Thorpe died while this litigation was pending. He and the Foundation for Middle East Peace were the original plaintiffs. This litigation is now being pursued by that foundation and the executor of Thorpe's estate. For the sake of convenience both will be referred to as "Thorpe" in this opinion.

these factual determinations made after trial if supported by the record and not clearly erroneous. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

CERBCO is a holding company with voting control of three subsidiaries. At the relevant time, 1990, only one of these subsidiaries, Insituform East, Inc. ("East"), was profitable. The continued profitability of East was in doubt, however, because its regional license to conduct its primary business was about to expire. This license to exploit a process used in the in-place repair of pipes was obtained from Insituform of North America, Inc. ("INA").

CERBCO's capital structure consisted of two classes of stock. Class A was entitled to one vote per share, and Class B was entitled to 10 votes per share. In addition, the Class B shares were empowered to elect 75% of the board of directors. The Erikson brothers constituted CERBCO's controlling group of shareholders, owning 247,564 or 78% of the outstanding Class B shares, and 111,000 or 7.6% of the outstanding shares of Class A. Thus, while the Eriksons owned 24.6% of CERBCO's total equity, they exercised effective voting control with approximately 56% of the total votes. The Eriksons also constituted two of the four members of CERBCO's board of directors.

East's capital structure and that of the other two subsidiaries is similar to that of CERBCO. East's certificate of incorporation provides for each of the 318,000 Class B shares to have ten votes, while the 4.3 million Class A shares have one vote each. In addition, the Class B shares elect 75% of the board of directors. CERBCO owned 1.1 million shares of Class A (26% of the outstanding Class A shares) and 93% of the Class B shares.

In the fall of 1989, INA explored the possibility of acquiring one of its sublicensees. East, because of its location and profitability, seemed a likely prospect. James D. Krugman ("Krugman"), INA's Chairman, retained Drexel, Burnham, Lambert & Company ("Drexel") to advise him. Based on public information, Drexel performed financial analyses and devised hypothetical plans for acquisition of control of East. These financial analyses, however, incorrectly assumed that East had a single class of shares and that the market capitalization of its Class A common stock represented the market capitalization of the whole firm.

In January 1990, Krugman met with the Eriksons to discuss the possibility of INA's acquiring East. At this first meeting Krugman was unaware of CERBCO's capital structure, which conferred control on the Eriksons, and presumably approached the Eriksons in their representative capacities as officers and directors. Although the factual record is disputed as to what occurred at this meeting, the Chancellor found that the Eriksons made a counterproposal to Krugman after he expressed interest in purchasing East from CERBCO.[2] This counterproposal involved the Eriksons' selling their controlling interest in CERBCO to INA. It is unclear whether or not the Eriksons explicitly stated that they would block an attempt by INA to buy East from CERBCO. Nevertheless, the Chancellor found that Krugman was led to believe that the Eriksons would permit only the transaction involving their sale of CERBCO stock to INA.

After the first meeting with the Eriksons, Krugman believed it necessary to consider seriously the Eriksons' proposal. Thereafter, INA had Drexel perform comparative financial projections of transactions by which it could gain control of East. In one of these studies, Drexel analyzed three potential transactions: (1) acquiring all of CERBCO's common stock and Class B stock in East (1.1 million common and 297,000 Class B or 30.2% of East) for a total price of $10.5 million; (2) acquiring 247,550 CERBCO Class B shares from the Eriksons for $6.0 million; and (3) acquiring all of CERBCO's Class A shares (1.14 million) via a cash tender offer of $3.8 million and all of CERBCO's Class B shares (318,000 shares) for $7.7 million in cash, for a total acquisition cost of $11.5 million. These scenarios suggested that, while a direct pur-

---

**2.** The Chancellor noted "that Krugman, himself, repeatedly stated in his deposition that once the Eriksons knew that INA was interested in controlling East, it was the Eriksons who proposed that INA purchase their stock, rather than the East stock from CERBCO."

chase of CERBCO's East stock had a higher initial cost than a purchase of the Eriksons' holdings, in certain respects it would be preferable since the indebtedness of Capital Copy, one of CERBCO's subsidiaries, would not be assumed in the latter transaction.

The Eriksons did not inform CERBCO's outside directors, George Davies and Robert Long, that INA had approached the Eriksons with the intention of buying East from CERBCO, but did inform them of INA's interest in buying the Eriksons' stock. Upon learning this, Davies suggested to Robert Erikson that CERBCO sell East to INA, but Robert Erikson rejected this idea.

At the February 22, 1990 CERBCO board meeting, Davies asked whether INA had ever been interested in buying East. The Eriksons denied that INA had ever made such an offer, and had INA done·so, the Eriksons indicated that they would likely vote their shares to reject it. According to draft minutes of the February 22, 1990 meeting, Rogers & Wells, who regularly served as counsel to CERBCO, advised the members of the Board that, as part of a proposed letter of intent that was being negotiated between the parties, INA would be given access to CERBCO's books and records for its due diligence review prior to the execution of a final agreement. The outside directors agreed.

In addition to securing the cooperation of CERBCO officials in making CERBCO's records available in INA's due diligence examination, the Eriksons also sought board approval of their use of Rogers & Wells as their personal counsel in their negotiations with INA. Rogers & Wells gave CERBCO its written statement that, in its opinion, there was no conflict of interest between the Eriksons and CERBCO because the proposed transaction was a private deal by the Eriksons that did not implicate CERBCO's interests. The board thereafter consented to the representation.

On March 12, 1990, the Eriksons and INA signed a letter of intent ("LOI") for the sale of the Eriksons' controlling interest in CERBCO for $6 million. The letter of intent required the Eriksons to give INA access to CERBCO's books and records, subject to INA's agreement to keep the information confidential, and required INA to indemnify the Eriksons for any costs associated with litigation arising from the consummation of the proposed transaction. It also restricted the Eriksons' activities with respect to other potential buyers:

> The Sellers (or either of them) shall not for a period from the date hereof to the first to occur of (a) April 23, 1990, (b) the Closing or (c) the date of abandonment by INA of negotiations regarding the Stock Purchase Agreement, elicit, enter into, entertain or pursue any discussions or negotiations with any other person or entity with respect to the sale of any of the Shares or any other transaction the effect of which if completed, would frustrate the purposes of this letter.

The LOI required that the parties not disclose its terms unless such disclosure was required by law. The outside directors reviewed the letter at a March 1990 INA sublicensees convention in Hawaii.

On May 11, 1990, Thorpe lodged a demand with the CERBCO board that the proposed transaction be rejected or that the Eriksons provide an accounting for the control premium associated with the sale of their Class B shares. In July, the two outside directors formed a special committee, which terminated representation by Rogers & Wells and hired Morgan, Lewis & Bockius to represent CERBCO.

While negotiations between the Eriksons and INA continued, the LOI expired and on May 30 INA paid the Eriksons $75,000 to extend the terms through August 1, 1990.

At the September 14, 1990 CERBCO board meeting, the board considered an alternative transaction involving the issuance of authorized CERBCO Class B stock to INA so that it could have a measure of control over East. The Eriksons objected to this proposal, which would destroy not only the Eriksons' control value, but that of the other CERBCO shareholders.

On September 18, 1990, the letter of intent between the Eriksons and INA expired without consummation of the sale. Evidently,

the Eriksons and INA were unable to agree on such issues as indemnification for liabilities that might arise out of an SEC suit pending at the time, and the payment of litigation costs related to the transaction which the Eriksons had already incurred.

## II.

Thorpe filed suit on August 24, 1990, contending that the Eriksons had diverted from CERBCO the opportunity to sell East to INA so that the Eriksons could instead sell their control over CERBCO. In addition, Thorpe alleged disclosure violations relating to proxy statements issued in 1982 and 1990, and also charged the directors with waste of corporate assets used to pay legal fees to defend the litigation. Several pretrial rulings narrowed the claims asserted.

On November 15, 1991, the Chancellor ruled upon the defendants motion to dismiss for failure to state a claim upon which relief could be granted and failure to comply with the pre-suit demand rule. *Thorpe v. CERBCO, Inc.*, Del.Ch., 611 A.2d 5 (1991). In refusing to dismiss the corporate opportunity claim, the court ruled that the claim was derivative in nature and, even though controlling shareholders have no obligation to share a control premium, the Eriksons' use of corporate apparatus to secure this premium triggered a duty to share this premium with the corporation and its shareholders. "Such behavior . . . is very far from the simple sale of a stockholder's stock." *Id.* at 10. Moreover, the Chancellor was not satisfied that the entire board had conducted a reasonable review of the shareholder demand, so the claim was not subject to dismissal under Court of Chancery Rule 23.1.

The Chancellor also ruled for Thorpe in holding that the disclosures accompanying the 1982 recapitalization were not time-barred. In addition, the possibility remained that Thorpe could prove that the Eriksons failed to disclose that their purpose was to acquire control with the recapitalization and then profit from the control premium. Finally, the disclosure claim regarding the 1990 election of directors was held to be moot due to an intervening election.[3]

The Eriksons next moved for summary judgment, which was denied in an October 29, 1993 memorandum opinion. *Thorpe v. CERBCO, Inc.*, Del.Ch., C.A. No. 11713, 1993 WL 443406, Allen, C. (Oct. 29, 1993), *reprinted in* 19 Del.J.Corp.L. 942 (1993).[4] Summary judgment was precluded by open factual questions, including whether or not a sale of CERBCO's interest in the East Class B stock would constitute a sale of substantially all of CERBCO's assets under 8 *Del.C.* § 271.[5] If CERBCO's controlling interest in East constituted substantially all of CERBCO's assets, then the Eriksons, as controlling shareholders of CERBCO, would have the right to veto this sale under 8 *Del.C.* § 271. Accordingly, "the public shareholders [would have] no right to require [the Eriksons] as directors to pursue a transaction over which they rightfully held a veto as shareholders."

Section 271 requires shareholder approval of a sale of all or substantially all of a corporation's assets. As a corollary to this right of approval, the court held that a shareholder was entitled to vote entirely in his or her own self-interest. Consequently, the Eriksons, as shareholders, would have no obligation to support any transaction they did not personally favor. According to the

---

**3.** In a later ruling, the Chancellor dismissed the claims of disclosure violations relating to the 1982 proxy statement on the basis of lack of standing since Thorpe was not a shareholder in 1982. It was ruled that while the plaintiff's claim was not barred by the contemporaneous holding requirement which applies to derivative actions, Thorpe nonetheless could only complain of breaches of fiduciary duty which occurred while he was a shareholder. That ruling has not been appealed.

**4.** In this memorandum opinion, the Chancellor reversed his previous decision that the Eriksons'

use of corporate processes to facilitate their sale of control was improper. Specifically, he held that the sale of the Eriksons' stock would constitute a proper purpose for inspection of books and records under 8 *Del.C.* § 220, especially given the fact that there was little danger of the disclosure of competitively significant information.

**5.** 8 *Del.C.* § 271 provides that "[e]very corporation may . . . sell . . . all or substantially all of its property and assets . . . as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon. . . ."

Chancellor, the Eriksons were not required to act altruistically toward the non-controlling shareholders, but their fiduciary duty would not allow the Eriksons to force an unfair transaction on them. Foreshadowing his 1995 opinion, the Chancellor went on to note that no unfairness could be inferred under these facts. Thus, a finding that CERBCO's sale of its East shares was a sale of substantially all of its assets implied that the Eriksons would not be found liable for pursuing their own interests.

This reasoning rested on the premise that the sale of CERBCO's East shares was the only economically viable alternative to the INA–Erikson transaction. In reaching this decision, the Chancellor analyzed other possibilities, including the issuance of CERBCO Class B stock to INA. This proposal had the disadvantage that it would not transfer full control to INA and would have the further negative consequence of diluting the Eriksons' holdings while not cashing them out. Since the sale of CERBCO's B shares of East was the only viable alternative to the Eriksons' sale of control, it was the only one that needed to be evaluated for the purposes of the application of § 271. The "substantially all" analysis of this one possible alternative transaction needed additional factual development and was left for trial.

The Chancellor then separately addressed the contention that the Eriksons had usurped a corporate opportunity and held that summary judgment was also inappropriate on that claim under the rubric of *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 511 (1939). The Eriksons' summary judgment contentions regarding the factual and legal insufficiency of Thorpe's corporate opportunity claim were rejected. The Chancellor ruled that factual issues remained including: (i) whether or not INA had any desire or was financially able to purchase control of East from CERBCO, (ii) whether selling the East stock would have been advantageous to CERBCO, and (iii) whether an SEC investigation would preclude CERBCO from selling East to INA.

Lastly, the court below denied summary judgment on Eriksons' contentions that the plaintiffs had suffered no actionable damages. The Eriksons essentially argued that the plaintiffs' injuries were too hypothetical and not based on credible evidence that INA's purchase of East from CERBCO would have been in excess of East's fair value. In addressing this issue, the court held that "once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer." Thorpe would therefore have an opportunity to present evidence on the issue since the record at the time of the motion did not preclude the possibility that such evidence existed.

### III.

The August 9, 1995 opinion of the Court of Chancery, after trial, is the subject of this appeal and can be summarized as follows. The Chancellor found that the Eriksons did not act appropriately when Krugman informed them of INA's interest in gaining control of East. The Eriksons' lack of candor and negotiations with INA on their own behalf constituted a breach of the duty of loyalty which the Eriksons owed as directors to the corporation.[6]

Despite finding this breach, the Chancellor held that the plaintiffs would not be awarded damages since the defendants actions were wholly fair. Two reasons were advanced to support the denial of damages. First, no sale had occurred and therefore damages were speculative. The Chancellor found it impossible to calculate a meaningful remedy, *i.e.*, the difference in the value of the control premium in 1990 minus the value of the control premium today.

The second reason given by the Chancellor for not awarding damages is that § 271 confers upon the Eriksons the right to veto any corporate change constituting the sale of substantially all of the corporation's assets. Under the facts of this case, any alternative transaction conceivably undertaken by CERBCO would implicate the provisions of

---

6. This finding of violation of the duty of loyalty was not cross-appealed and forms the predicate

for further discussion of the damages claim.

§ 271 and therefore be subject to disapproval by the Eriksons. Accordingly, the Chancellor held the Eriksons could not be penalized for their breach of the duty of loyalty.

## IV.

As the Chancellor acknowledged at the threshold of his opinion, this "action raises issues falling within the gravitational pull of two basic precepts of corporate law: (1) that controlling shareholders have a right to sell their shares, and in doing so capture and retain a control premium; and (2) that corporate officers or directors may not usurp a corporate opportunity." Forced to reconcile these two imperatives, the trial court, in essence, concluded that the former trumped the latter. Thus, the Eriksons' right to pursue a control premium relieved them from any liability for the breach of fiduciary duty in the process.

■ We agree that in a particular setting these two precepts of corporate law may tend to pull in opposite directions, but the statutorily granted rights under § 271 cannot be interpreted to completely vitiate the obligation of loyalty. The shareholder vote provided by § 271 does not supersede the duty of loyalty owed by control persons, just as the statutory power to merge does not allow oppressive conduct in the effectuation of a merger. Rather, this statutorily conferred power must be exercised within the constraints of the duty of loyalty. *Bershad v. Curtiss–Wright Corp.*, Del.Supr., 535 A.2d 840, 845 (1987); *Ringling Bros.–Barnum & Bailey Combined Shows v. Ringling*, Del. Supr., 53 A.2d 441, 447 (1947). In practice, the reconciliation of these two precepts of corporate law means that the duty of a controlling shareholder/director will vary according to the role being played by that person and the stage of the transaction at which the power is employed.

■ The fundamental proposition that directors may not compete with the corporation mandates the finding that the Eriksons breached the duty of loyalty. *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510 (1939); *see also Broz v. Cellular Information Systems, Inc.*, Del.Supr., 673 A.2d 148, 154–55, (1996). When INA's president, Krugman, approached the Eriksons, he did so to inquire about INA's purchase of CERBCO's shares in East, not the purchase of the Eriksons' shares in CERBCO. Since the Eriksons were approached in their capacities as directors, their loyalty should have been to the corporation. The Chancellor correctly found that the Eriksons had breached that duty of loyalty through self-interest in subsequent actions. The Eriksons should have informed the CERBCO board of INA's interest in gaining control of East since INA originally wanted to deal with CERBCO.[7] *See Restatement (Second) of Agency* § 381.

Once INA had expressed an interest in acquiring East, CERBCO should have been able to negotiate with INA unhindered by the dominating hand of the Eriksons. *Cf. Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710–11 (1983) (director should not participate in negotiations if conflict of interest would result); *Bershad*, 535 A.2d at 845. The Eriksons were entitled to profit from their control premium and to that end compete with CERBCO but only after informing CERBCO of the opportunity. Thereafter, they should have removed themselves from the negotiations and allowed the disinterested directors to act on behalf of CERBCO.

## V.

### A.

After finding a breach of the duty of loyalty, the Chancellor tested the defendants' actions for entire fairness, but this test is an unwieldy instrument to use in circumstances

---

7. Because of CERBCO's clear interest in the opportunity in this case, disclosure to the board of directors was required. *See Restatement (Second) of Agency* § 381. Disclosure to and informed approval by the board may insulate a director from liability where the corporate opportunity doctrine otherwise applies. *See Fliegler v. Lawrence*, Del.Supr., 361 A.2d 218, 220 (1976). A director who opts not to inform the board of the opportunity acts at his peril, unless he is ultimately able to demonstrate *post hoc* that the corporation was not deprived of an opportunity in which it had an interest in or capability of engaging. *Broz v. Cellular Information Systems, Inc.*, Del.Supr., 673 A.2d 148, 157, (1996).

such as the breach of duty that occurred here. The test of entire fairness comprises price and procedure. *Weinberger*, 457 A.2d at 711. Because no price was ever received and the procedure amounted to a breach of the duty of loyalty, the Chancellor's finding of entire fairness here is enigmatic.[8] We find the corporate opportunity doctrine to be a better framework than entire fairness analysis for addressing the Eriksons' duties as directors.[9]

In applying the corporate opportunity doctrine, *Guth v. Loft* requires the Court to examine several elements:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

5 A.2d at 511.

In this case, it is clear that the opportunity was one in which the corporation had an interest. Despite this fact, CERBCO would never be able to undertake the opportunity to sell its East shares. Every economically viable CERBCO sale of stock could have been blocked by the Eriksons under § 271. Since the corporation was not able to take advantage of the opportunity, the transaction was not one which, considering all of the

relevant facts, fairly belonged to the corporation. *See Fliegler v. Lawrence*, Del.Supr., 361 A.2d 218, 220 (1976) (finding no liability since corporation was not financially or legally able to take advantage of opportunity).

### B.

Generally, the corporate opportunity doctrine is applied in circumstances where the director and the corporation compete against each other to buy something, whether it be a patent, license, or an entire business. This case differs in that both the Eriksons and CERBCO wanted to sell stock, and the objects of the dispute, their respective blocks of stock to be sold, were not perfectly fungible. In order for the Eriksons and CERBCO to compete against one another, their stock must have been rough substitutes in the eyes of INA. If INA considered none of the CERBCO transactions to be an acceptable substitute to the INA–Erikson transaction, then the opportunity was never really available to CERBCO. Thus, those transactions which were not economically rational alternatives need not be considered by a court evaluating a corporate opportunity scenario.

The Chancellor thoroughly examined the evidence presented by the parties to determine that only one transaction presented a serious alternative to an Erikson–INA deal. This one viable alternative involved the sale of all of CERBCO's East stock for a price of $12.8 million. This finding was logically derived from the record below and will not be disturbed on appeal. *Levitt v. Bouvier*, Del. Supr., 287 A.2d 671, 673 (1972).

---

**8.** In this case, the judicial determination of fair price would require exploration of what the Chancellor termed a "counterfactual universe," involving a comparison of two hypothetical worlds: one in which the Erikson–INA transaction occurred, and another in which some transaction between INA and CERBCO occurred.

**9.** The facts here resemble the paradigm usurpation of a corporate opportunity. *See, e.g., Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503 (1939) (officer may not compete with corporation). In contrast, the entire fairness test is usually applied in a situation where minority shareholders have actually received some value in return for their shares, but the value was determined as a result of a bargaining process in which the controlling

shareholder was in a position to influence both bargaining parties. *See, e.g., Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638 A.2d 1110, 1115 (1994) (entire fairness test applied in buy-out of minority shareholders by controlling shareholder).

Not only were the Eriksons without power to force INA to offer a potentially unfair price, the Eriksons had no financial incentive to do so. The premise of the entire fairness test is that the business judgment rule is inapplicable where self-interest may have colored directors' actions. *Weinberger*, 457 A.2d at 710. Since the Eriksons could not further their own interests by depressing the price paid by INA, the purpose for applying the entire fairness test is absent in this case.

### C.

■ After dispensing with unrealistic alternatives, we are left to consider a CERBCO sale of all its East stock to INA. Whether or not the Eriksons had a right to block an alternative transaction turns on whether this transaction would constitute all or substantially all of CERBCO's assets and require shareholder approval under § 271. We are satisfied that the Court of Chancery correctly applied the law to the facts of this case in making the determination that, in 1990, CERBCO's investment in East constituted substantially all of CERBCO's assets.

The standard for determining whether shareholder approval is required under § 271 was set forth in *Oberly v. Kirby*, Del.Supr., 592 A.2d 445, 464 (1991):

> [T]he rule announced in *Gimbel v. Signal Cos.*, Del.Ch., 316 A.2d 599, *aff'd*, Del. Supr., 316 A.2d 619 (1974), makes it clear that the need for shareholder ... approval is to be measured not by the size of a sale alone, but also by its qualitative effect upon the corporation. Thus, it is relevant to ask whether a transaction "is out of the ordinary and substantially affects the existence and purpose of the corporation." [*Gimbel*, 316 A.2d] at 606.

In the opinion below, the Chancellor determined that the sale of East would constitute a radical transformation of CERBCO. In addition, CERBCO's East stock accounted for 68% of CERBCO's assets in 1990 and this stock was its primary income generating asset. We therefore affirm the decision that East stock constituted "substantially all" of CERBCO's assets as consistent with Delaware law.

### D.

■ Because the alternative transaction would have been covered by § 271, the Eriksons had the statutory right as shareholders to veto this transaction. Given their power, the Eriksons would obviously never allow CERBCO to enter a transaction against their economic interests. Damages cannot be awarded on the basis of a transaction that has a zero probability of occurring due to the lawful exercise of statutory rights.

■ It is true that the Eriksons breached their fiduciary duties and that damages flowing from that breach are to be liberally calculated. *See Milbank, Tweed, Hadley & McCloy v. Boon*, 2d Cir., 13 F.3d 537, 543 (1994). Section 271 must, however, be given independent legal significance apart from the duty of loyalty. *Cf. Orzeck v. Englehart*, Del.Supr., 195 A.2d 375, 377 (1963) (compliance with one provision of the General Corporation Law protects actions from invalidation). While the failure of CERBCO to sell East to INA is certainly related to the Eriksons' faithlessness, that failure did not proximately result from the breach. Instead the Eriksons' § 271 rights are ultimately responsible for the nonconsummation of the transaction. Even if the Eriksons had behaved faithfully to their duties to CERBCO, they still could have rightfully vetoed a sale of substantially all of CERBCO's assets under § 271. Thus, the § 271 rights, not the breach, were the proximate cause of the nonconsummation of the transaction. Accordingly, transactional damages are inappropriate.

While this denial of transactional damages may seem incompatible with our decision to award damages for the breach of fiduciary duty, the two holdings are reconcilable. At the time that Krugman approached the Eriksons, they had the duty to present that opportunity to CERBCO. Instead the Eriksons negotiated with INA for their own benefit and are therefore liable for value received in the course of this negotiation and expenditures made by CERBCO to aid the Eriksons in their negotiations. While the Eriksons did have a duty to present that opportunity to CERBCO, they had no responsibility to ensure that a transaction was consummated. Any INA–CERBCO transaction would have required a shareholder vote and the Eriksons were entitled to pursue their own interests in voting their shares. The failure of INA and CERBCO to reach an agreement was proximately caused by the Eriksons' ability to block the transaction, not by the Eriksons' breach of the duty of loyalty. Consequently, no liability arises from the breach for the inability of CERBCO to take advantage of the opportunity to sell its control of East to INA.

## VI.

■ Despite the finding of breach of loyalty by the Eriksons, the Chancellor concluded that the Eriksons were not liable because the corporation had not been harmed and the Eriksons had not profited substantially. As discussed in part IV, *supra,* we view the record differently and determine that as a matter of law damages should have been awarded. The Eriksons profited from their dealings with INA, and CERBCO incurred certain expenses in connection with these negotiations which it would not otherwise have incurred had the Eriksons not attempted to expropriate the INA sale opportunity.

Even though the corporation may not have been able to effectuate the transaction because of the Eriksons' rights under § 271, some recovery is warranted because of the breach of fiduciary duty. Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. Although this Court in *In re Tri–Star Pictures, Inc., Litig.,* Del.Supr., 634 A.2d 319 (1993), was addressing disclosure violations, we reasoned from a more general standard concerning the duty of loyalty:

> "[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position. It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity." *Oberly v. Kirby,* Del.Supr., 592 A.2d 445, 463 (1991). The distinction we noted in *Oberly* explains why no Delaware court has extended the damage rule to actions for breach of the duty of loyalty. . . .

*In re Tri–Star Pictures,* 634 A.2d at 334 (footnote omitted); *accord Milbank,* 13 F.3d at 543 ("breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages"). The strict imposition of penalties under Delaware law are designed to discourage disloyalty.

> The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503, 510 (1939).

Once disloyalty has been established, the standards evolved in *Oberly v. Kirby* and *Tri–Star* require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct. While there are no transactional damages in this case, we find the Eriksons liable for damages incidental to their breach of duty. Specifically the Eriksons are liable to CERBCO for the amount of $75,000 received from INA in connection with the letter of intent. *See J. Leo Johnson, Inc. v. Carmer,* Del. Supr., 156 A.2d 499, 503 (1959); *see also Restatement (Second) of Agency* § 388 (agent must account for value received from third parties in connection with services on behalf of principal). In addition, the Eriksons must reimburse CERBCO for any expenses, including legal and due diligence costs, that the corporation incurred to accommodate the Eriksons' pursuit of their own interests prior to the deal being abandoned by the Eriksons and INA.

The opinion below is AFFIRMED IN PART and REVERSED IN PART, and this matter is REMANDED to the Court of Chancery for a further determination of damages. Once those damages are fixed, the court should proceed to examine anew any petition for counsel fees on behalf of the plaintiffs.