Donald **RYAN**, David **Ryan**, and
**Cede & Co., Petitioners,**

v.

**TAD'S ENTERPRISES, INC., a Delaware corporation, Respondent.**

**Donald RYAN and David Ryan, Plaintiffs,**

v.

**TAD'S ENTERPRISES, INC., a Delaware corporation, Don Townsend, Neal Townsend and Bernard Bressler, Defendants.**

**Civil Action Nos. 10229, 11977.**

Court of Chancery of Delaware,
New Castle County.

Submitted: May 15, 1996.
Decided: June 13, 1996.

Robert K. Payson and Arthur L. Dent, Potter, Anderson & Corroon, Wilmington, and Sidney Bender and Risa Bender, of Leventritt, Lewittes & Bender, New York City, for Petitioners and Plaintiffs.

Kenneth J. Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, for Respondent and Defendants.

JACOBS, Vice Chancellor.

On April 24, 1996, this Court handed down its Opinion adjudicating these actions on the merits. *Donald Ryan, et al. v. Tad's Enterprises, Inc., et al.,* Del. Ch., 709 A.2d 682 (1996) ("Opinion"). On May 8, 1996, both sides filed motions for reargument of certain of the rulings in the Opinion.

This is the decision of the Court on both reargument motions. No effort is made to recapitulate or summarize the Court's factual findings or legal conclusions, except where it is necessary to address the reargument issues.

## I. *THE PLAINTIFFS' REARGUMENT MOTION*

The plaintiffs have moved for reargument with respect to three rulings: (1) the Court's determination not to award rescissory damages, (2) its decision to reduce the prejudgment interest rate because of the plaintiffs' excessive delay in prosecuting the case, and (c) the Court's ruling that the plaintiffs were not entitled to an award of attorneys fees. Reargument will be denied for the reasons discussed below.

### A. *Rescissory Damages*

In seeking reargument of the Court's determination that they are not entitled to rescissory damages, the plaintiffs rely on the Supreme Court's recent decision in *Thorpe v. CERBCO, Inc.,* Del.Supr., 676 A.2d 436 (1996) ("*Thorpe*"). The plaintiffs suggest that *Thorpe* mandates an award of rescissory damages whenever a defendant is found to have breached the duty of loyalty. *Thorpe* announced no such rule. In *Weinberger v. UOP, Inc.,* 457 A.2d 701, 714 (1983), the Supreme Court held that if a defendant fails to satisfy the test of entire fairness, this Court may "fashion any form of equitable and monetary relief as may be appropriate ...". The Court in *Thorpe* applied that principle in circumstances involving an adjudicated breach of fiduciary duty, holding that a recovery in some amount is warranted even if specific damages cannot be proven. *Thorpe, supra* at 445. That approach, con-

sistent with *Weinberger,* was followed in this case.

█ In its Opinion, the Court found that rescissory damages would be inappropriate because of the plaintiffs' excessive delay. Nothing in the plaintiffs' reargument papers suggests that in so concluding, the Court overlooked a controlling principle or decision of law or misapprehended a significant fact. *See Miles, Inc. v. Cookson America, Inc.,* Del. Ch., 677 A.2d 505 (1995). On that basis alone reargument must be denied.

There is a second reason—argued in defendants' post-trial brief but not explicitly addressed in the Opinion—why rescissory damages would be inappropriate. Plaintiffs seek rescissory damages only for that portion of Tad's that *increased* in value (Cell Tech), but not for those portions that *declined* in value (EPG), after the Merger. Four years after the Merger, Cell Tech was sold for significantly more than the value the Tad's board had attributed to it in the Merger. Thus, at trial the plaintiffs claimed values for Cell Tech of $14 million, or alternatively, $10.8 million, calculating both values as of the date of trial.

Unlike Cell Tech, however, EPG did materially *worse* after the Merger: for FYE April 30, 1994, EPG reported a loss of approximately $460,000. (PX 158 at 13339). Plaintiffs valued EPG as of the date of the Merger, not as of the date of trial.

To put the plaintiffs' argument into perspective, what the plaintiffs have done is to (i) delay asserting their rescissory damage claim until the post-Merger results were knowable and then, (ii) demand the value of Cell Tech as of the date of trial yet (iii) simultaneously demand the value of EPG as of the date of the Merger. This "partial rescission" approach, if accepted, would permit the plaintiffs to recover the appreciation in value for that component of Tad's that prospered after the Merger, while avoiding the consequences of the decrease in value for the business that fared less well.

The plaintiffs cannot have it both ways. They cannot be allowed opportunistically to speculate by valuing one component of Tad's as of a date years after the Merger, and the

remainder of Tad's as of the Merger date. *See, Myzel v. Fields,* 386 F.2d 718, 740–741, n. 15 (8th Cir.1967); *Gaffin v. Teledyne,* Del. Ch., C.A. No. 5786, Hartnett, V.C., Mem. Op. at 49, 1990 WL 195914 (Dec. 4, 1990). Because the plaintiffs presented no evidence of the value of the entirety of Tad's as of the trial date, they are not entitled to rescissory damages on that basis as well.

### B. *Reduction in Interest Rate for Excessive Delay*

The plaintiffs next seek reargument of the Court's ruling that their excessive delay in prosecuting this case justified a reduction in the rate of prejudgment interest. In their trial brief, the plaintiffs argued (factually) that the delay was not their fault, but was attributable to discovery abuses perpetrated by the defendants. Rejecting that argument, the Court found that the defendants' resistance to discovery would not have justified the magnitude of the plaintiffs' delay. (Opinion at 699, n. 20).

■ The plaintiffs now attempt to expand their discovery-abuse claim. They assert that the defendants noticed their own depositions in March, 1990, not to preserve the testimony of the Townsends but to further a *more insidious scheme to conceal information* about Cell Tech's imminent sale. No evidence is offered to support this newly minted assertion. Moreover, the record shows that the plaintiffs had sufficient information to pursue their liability action at the time of the Merger. (*See, generally,* Tad's Proxy Statement, DX 86). Although the plaintiffs protest that they were "lay persons" who were unable to appreciate the legal implications of the information then available, the record shows that plaintiffs had consulted with their present counsel as early as November 1987. (Tr. at 454). An award of prejudgment interest may be reduced, in the Court's discretion, to reflect a plaintiff's excessive delay. *Wacht v. Continental Hosts, Ltd.,* Del. Ch., C.A. No. 7954, Chandler, V.C., Mem. Op. at 8, 1994 WL 728836 (Dec. 23, 1994). Nothing presented by plaintiffs justifies reconsidering that exercise of discretion in this case.

### C. *Attorneys Fees*

■ Finally, the plaintiffs seek reargument of the Court's determination that the plaintiffs were not entitled to attorneys fees. The Court held that because these cases were brought as individual actions, as distinguished from a derivative or class action, any benefit created by the litigation was enjoyed solely by the plaintiffs. Because there was no factual basis to apportion the fees incurred by plaintiffs among a larger class of benefitted persons, the only basis for fee shifting would have been bad faith, *i.e.,* that the defendants acted egregiously by misusing the litigation process. The Court found that no bad faith (in the foregoing sense) had been shown. Opinion at 706.

In their reargument motion the plaintiffs do not frontally challenge that ruling. Instead they assert that *Thorpe* "compels" an attorneys fee award once a breach of the duty of loyalty is found. (Plaintiffs' Reargument Motion at 9). *Thorpe* stands for no such rule. It was a derivative action where the majority stockholders (who were also directors) were found liable for usurping a corporate opportunity. The defendants were ordered to restore monies they had caused the corporation to expend to pursue a transaction that favored the defendants' personal interests over the interests of the corporation. The recovery in *Thorpe,* unlike the recovery in this case, would have benefited all of the corporation's stockholders, not just the named plaintiffs. It was in that dispositively different setting that the Supreme Court remanded the case to this Court with instructions to "examine anew" any petition for counsel fees once damages were fixed. *Thorpe,* 676 A.2d at 445.

In summary, nothing advanced by the plaintiffs warrants reargument on this issue.

### II. *THE DEFENDANTS' REARGUMENT MOTION*

The defendants have also moved for reargument, claiming that the Court erred in four respects: (1) by determining that the entire $2 million paid to the Townsends as consulting/noncompete payments in the Asset Sale, was recoverable by the corporation; (2) by deciding that the defendants had

wrongfully overreserved $1,366,995 for taxes; (3) by adopting the Tad's board's valuation of EPG in the Merger as the fair value of EPG; and (4) by refusing to credit the defendants with $26,500 paid to plaintiffs for 2,000 Tad's shares that the plaintiffs' broker had inadvertently tendered in the Merger. For the following reasons, the defendants' reargument motion must also be denied.

## A. *The Noncompete/Consulting Payments*

█ The defendants contend that the Court erred in finding that $2 million was the measure of damages for their wrongful diversion of the consulting/noncompete payments. First, the defendants claim that the $2 million should have been discounted because those payments were received over a 5 year period. Second, defendants argue that the resulting damage figure should have been further reduced by the various federal, state, and local taxes that would have been payable. Thus, the true measure of this damage item, defendants conclude, is the discounted, after-tax value of the $2 million consulting/noncompete payments, which translates to a $2.34 per share reduction in the damages award.

These contentions are flawed because the defendants failed to develop an adequate record to support them. Hence, reargument on this issue is not merited.

As a purely conceptual matter, the defendants are correct in their view that the value as of the Merger date of the $2 million payments to the Townsends was not $2 million, but an appropriately discounted lesser amount. That is because the $2 million would be paid over five years. However, that argument still does not carry the day, because once the plaintiffs proved (*prima facie*) a $2 million damage amount, the burden shifted to the defendants to prove that

the damages award should be less. That burden required the defendants to establish (presumably through expert testimony) an appropriately discounted damage figure. At the trial, the defendants never presented any proof of an appropriate discount rate, nor did they otherwise attempt to calculate a discounted damage figure.

Now, for the first time, the defendants advocate (in a motion for reargument) that the $2 million should have been discounted by 11%—a rate that was never the subject of any testimony. The 11% rate was selected by this Court for an entirely unrelated purpose, namely, to determine the appropriate rate of prejudgment interest. Opinion at 705. Thus, the defendants in effect criticize the Court for "misapprehending" a "fact" (an appropriate discount rate and discounted damage figure) that they themselves never advocated or proved through competent evidence at trial.

Similarly flawed is the defendants' second argument that the $2 million should have been reduced by all federal, state and local income, franchise and property transfer taxes that would have been payable on the $2 million. The undemonstrated premise of that argument is that a deduction for taxes was legally required. Assuming without deciding that that premise is valid [1], the argument fails because the defendants made no effort to establish by persuasive evidence the appropriate tax rates or after-tax values. In their post-trial briefs, the only evidence defendants cited on this point was the conclusory, nonspecific testimony of Mr. Bressler, an interested party-witness, about applicable tax rates (Trial Tr. 611–612). No independent expert testimony was offered to prove applicable tax rates or to calculate the precise overall impact of those rates on the $2 million

---

1. While admittedly the $2 million additional payment to Tad's would have been subject to tax, it is not clear that the liability of the fiduciaries who diverted the $2 million should be reduced by the amount of the taxes. Here the Townsends diverted to themselves $2 million (payable over 5 years) found to have belonged to the corporation. Basic principles of fiduciary law (including principles of restitution) would seem to require that those fiduciaries restore all of the diverted mon-

eys to the corporation, yet the defendants argue that they are not obligated to do that. Can a fiduciary be permitted to argue that because the corporation would have had to pay tax on the misappropriated amounts, the fiduciary is obligated to restore only the after-tax amount he diverted and be permitted to keep the balance for himself? The parties did not address this issue, for which reason I merely note it here and resolve the "tax" question on other grounds.

incremental amount.[2]   Given that state of the record, for the defendants to fault the Court for misapprehending "facts" never developed by competent evidence, is at best curious.

### B.   *The Overreserve For Taxes*

█   In its Opinion, the Court held the defendants liable for the $1,366,795 difference (described as an "overreserve") between the $3,969,000 initially deducted from the Merger price as a reserve for anticipated taxes, and the $2,597,205 actual tax liability. The Court found that the defendants had failed to establish the fairness of this arrangement, which permitted the defendants to retain the "excess" reserve previously deducted from the Merger Price to which *all* Tad's stockholders would otherwise have been entitled.   (Opinion at 695–696).

In their reargument motion the defendants quibble over the characterization of the $1,366,975 as an "overreserve".   They repeat their arguments that: (i) there was no "overreserve" because the reserved amount had been estimated in good faith, (ii) the "excess" was the result of losses that occurred in the 1989 tax year, months after the reserve was established; and (iii) because Tad's public shareholders were not made subject to the risk of those 1989 losses, they should not be entitled to the benefit of the reduced taxes those losses generated.

None of these contentions—all previously advanced and rejected—merit reargument. The reserve arrangement that the defendants unilaterally created had built-in incentives for the Townsends to manipulate expenses during the 1989 tax year so as to maximize tax deductions, minimize taxes, and keep the resulting "excess" reserve for themselves.   The losses to which the defendants refer were not the result of external events. The timing and the amount of tax-deductible expenses that would generate the "losses", such as employee and officer salaries and bonuses and Merger and Asset Sale-related costs, were substantially within the conflicted directors' control.

The critical, indisputable fact is that the minority stockholders, who had no one to represent their interests in the determination of the Merger price, were out-of-pocket $1,366,795 in "anticipated tax liabilities" that never came to fruition.   Unable to repose confidence in the fairness of the tax planning measures adopted by the disloyal directors, the Court concluded that the fair result would have been to require the restoration of the "excess" reserved funds to all of Tad's shareholders at the time of the Merger. That result does not establish a rule (as the defendants suggest) that "a board of directors of a merging company [must] share with stockholders who are being cashed out the tax reductions that may result from the surviving company's financial losses...." (Def. Reargument Motion at 6).   What it does reflect is that a court, having to value a company because a self-interested board failed to provide adequate representation for minority stockholders in a cash-out merger, will be disinclined to attribute significant weight to the conflicted board's justifications for its unilateral value determination.

### C.   *EPG Valuation*

The defendants next argue that the Court unfairly punished the defendants by choosing the Tad's board's higher valuation of EPG over the defendants' trial expert's lower valuation.

That argument misapprehends the Court's reasoning.   In concluding that the defendants' expert's valuation of EPG was more credible than that of the plaintiffs' expert, the Court did not intend to suggest that the defendants' expert's *ex post* valuation trumped the Tad's board's valuation at the time of the Merger.   To the extent that the Opinion did not make that clear, it should have.   The May 1988 valuation was made by knowledgeable insiders who had an interest in minimizing EPG's value for purposes of

---

**2.**   Perhaps recognizing the paucity of the record on this point, the defendants cite to the Proxy Statement (DX 86) (again, for the first time) as a basis to calculate the tax rates.   Even if that information is accurate, it would not obviate the need for expert testimony to establish the impact of the multitudinous taxes applicable to the Asset Sale, pursuant to the applicable laws of all the taxing jurisdictions in order to arrive at a "bottom line" damage figure.

the Merger. The Court considered that contemporaneous valuation more reliable than the defendants' trial expert's valuation, which was conducted six years later and for purposes of litigation. This Court adopted the Tad's board's May 1988 valuation not to "punish" the defendants, but because it was the most credible evidence of EPG's value at the time of the Merger.

### D. The $26,500 Payment for Reversal of The Inadvertent Tender

Finally, the defendants contend that the Court improperly failed to credit the defendants with the $26,500 the plaintiffs were paid for the 2,000 inadvertently tendered shares. The plaintiffs responded, and the Court found, that that transaction had been reversed and the $26,500 had been repaid. Having again reviewed the evidence, the Court adheres to its original determination.

At the trial the plaintiffs met their burden of going forward by introducing correspondence showing (i) Donald Ryan's instruction to his broker to reverse the inadvertent tender of the 2,000 shares and (ii) the broker's response that he had fulfilled those instructions (PX 4). The plaintiffs also introduced a brokerage statement showing that the inadvertent tender had been reversed, i.e., that the 2,000 shares had been credited to the brokerage account and $26,500 had been debited. (PX 159). These items of evidence, together with Mr. Ryan's trial testimony, created a reasonable inference (and enabled the Court to conclude) that the $26,500 paid to Ryan's account was repaid to Tad's.[3]

In response, the defendants proffered a September 30, 1994 letter from Tad's transfer agent (to which the plaintiffs made no hearsay or other objection) stating that certain share certificates had been canceled on May 17, 1989 and had not been reinstated. (DX 213). The defendants also offered a Tad's shareholder list that was dated September 23, 1992. (DX 212). Lastly, the defendants also offered Mr. Bressler's testimony that the $26,500 had never been received by Tad's.

The defendants' evidence did not persuasively rebut the plaintiff's prima facie showing that Tad's had been repaid the $26,500 in the reversing transaction. Tad's transfer agent, in DX 213, merely reported that certain share certificates that had been canceled on May 17, 1989 had not been reinstated. However, the 2,000 shares in question were not inadvertently tendered until August 27, 1990. (PX 4). Moreover, in DX 213, the statement to which the defendants attribute great significance, does not even mention the $26,500 payment. Tad's transfer agent states only that there were no outstanding shares in the name of Cede & Co. or Shearson Lehman Brothers, Inc. as of September 30, 1994. The September 1992 shareholder list (DX 212) is similarly uninformative. Thus, the plaintiff's documentation specifically shows the $26,500 was debited, whereas the defendants' documentation on that point was much less specific.

The only testimony offered by the defendants on this subject was Mr. Bressler's conclusory statement that the $26,500 was not received by Tad's. That testimony was not consistent with the documentary evidence viewed as a whole. For that reason, the defendants failed persuasively to rebut the plaintiffs' prima facie showing that the inadvertent tender of 2,000 shares (and the $26,500 payment therefor) had been reversed.

\*     \*     \*     \*     \*     \*

The plaintiffs' and the defendants' motions for reargument are both denied. IT IS SO ORDERED.

---

3. Although PX 159 was admitted only for the purpose of showing that the transaction had been reversed on the brokerage firm's records, that document, combined with the other evidence, was sufficient to establish that fact as a prima facie matter.