R. Arnold BOYER, Plaintiff,

v.

WILMINGTON MATERIALS, INC., a Delaware Corporation, Joseph J. Corrado, Frank L. Corrado, Kenneth A. Kershaw, Verino Pettinaro, Leonard I. Iacono, and Delaware Aggregates, Inc., a Delaware Corporation, Defendants.

C.A. No. 12549.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 17, 1998.
Decided: Jan. 20, 1999.

Wayne N. Elliott, April Caso Ishak, Sheela P. Dattani, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware, for plaintiff R. Arnold Boyer.

James S. Green, Daniel B. Rath, Duane, Morris & Heckscher, LLP, Wilmington, Delaware, for defendants Frank L. Corrado, Joseph J. Corrado, Kenneth A. Kershaw and Delaware Aggregates, Inc.

Jeffrey S. Goddess, Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, for defendants Verino Pettinaro and Leonard I. Iocano.

Brett D. Fallon, Smith, Katzenstein & Furlow, Wilmington, Delaware, for defendant Wilmington Materials, Inc.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

This action arises out of the sale of substantially all of the assets of defendant Wilmington Materials, Inc. ("WMI") to Delaware Aggregates, Inc. ("DAI"), approved by the board of directors of WMI, by a vote of 5 to 3, on January 14, 1992 (the "Asset Sale" or the "January 14, 1992 transaction"). At the time of the Asset Sale, DAI was owned by three of the five WMI directors voting to approve the transaction and the other two had secured, by contract, the right to become stockholders of DAI. A principal purpose of the Asset Sale was to eliminate plaintiff, R. Arnold Boyer ("Boyer") and one other stockholder from continued participation in the ownership and management of WMI's assets and business. The parties are in agreement that, due to the individual defendants' interest in the Asset Sale, defendants bear the burden of showing the entire fairness of that transaction.

This action was filed on May 1, 1992, individually and derivatively, naming as defendants Joseph J. Corrado ("J. Corrado"), Frank L. Corrado ("F. Corrado", or collectively with J. Corrado, "the Corra-

dos"), Kenneth A. Kershaw ("Kershaw"), Verino Pettinaro ("Pettinaro"), Leonard Iacono ("Iacono") and, nominally, WMI. On June 27, 1997, former Chancellor Allen denied, in most respects, Boyer's motion for summary judgment but granted summary judgment in favor of the defendants on Count II (claims for violations of the Stockholders Agreement [1]) and Count III (against defendant DAI alone claiming tortious interference with contract). Chancellor Allen also denied Boyer's motion for summary judgment on Count IV (conversion of Boyer's loans to WMI) [2] and J. Corrado's motion for summary judgment on his counterclaim seeking indemnification. *Boyer v. Wilmington Materials, Inc.*, Del. Ch., C.A. No. 12549, 1997 WL 382979, Allen, C. (June 27, 1997).

The case was tried over five days between June 22 and June 30, 1998. Post-trial briefing and argument followed. This is my decision on the merits. For the reasons discussed, *infra*, I find that defendants have failed to meet their burden of showing both the fair dealing and fair price aspects of the entire fairness standard applicable in interested transactions.

### A. Factual History

*1. Capitalization and Structure of WMI*

The business concept of WMI originated in a boom in the construction business in Delaware in the mid–1980's. At that time, there were three plants in New Castle County producing hot mix, i.e., bituminous asphalt paving material. Each one of these plants was owned by or affiliated with an entity that competed in business activities requiring hot mix and itself consumed significant quantities of hot mix. Companies that did not own their own supply of hot mix (including entities affili-

---

1. Summary judgment was awarded to defendants as to Boyer's claims regarding ¶ 7 (requirements provision), ¶ 11 (requiring shareholders to vote in a manner consistent with the agreement) and ¶¶ 5 and 6 (payment of dividends and commissions) of the Stockholders Agreement.

2. Count V was not addressed in the summary judgment opinion.

ated with the individual parties to this action) found themselves at a competitive disadvantage both in pricing and the availability of supply. In the summer of 1986, the parties to this litigation began to discuss the possibility of setting up a hot mix plant to assist their affiliates in their respective businesses. None of these affiliated entities alone generated an adequate demand for hot mix to justify the separate ownership and operation of a hot mix facility, but as a group they did. The concept the parties agreed upon was a "captive" operation, i.e., one in which the owners or their affiliates would be the primary customers of the plant and would be bound by contract to purchase their hot mix requirements from the plant.

The discussions among the parties led to a detailed Preincorporation Agreement, dated December 19, 1986. This document reflected the parties' agreement to form a corporation, to be known as Wilmington Materials, Inc., and to "set forth certain terms, conditions and covenants which shall apply to the formation of the Corporation, its capitalization, the conduct of its business affairs, the disposition of its revenues and the relationship among the parties as Stockholders." Shortly after this agreement was signed, and pursuant to authority delegated to him by the agreement, J. Corrado retained William E. Manning, Esquire ("Manning") of Duane, Morris & Heckscher, LLP ("DM & H"), a law firm, and James Horty of Horty & Horty ("Horty"), an accounting firm, to provide professional services to the proposed business enterprise. DM & H prepared WMI's certificate of incorporation, which was filed on February 12, 1987.

DM & H and Horty represented the Corrados' personal and business interests, before and after the formation of WMI. The Corrados arranged for Helicon Integrated Services, Inc. ("Helicon"), a corporation they controlled, to provide administrative services to WMI. Initially, J. Corrado served as President of WMI, but was succeeded in this position by Iacono.

Many of the terms of the Preincorporation Agreement were later incorporated into a superceding agreement by WMI and its stockholders executed May 26, 1987 ("Stockholders Agreement"). The Stockholders Agreement reflected the issuance of 250 shares of common stock, at $200 per share, to each of four "Stockholder Groups," as follows: (1) Boyer (affiliated with R.A. Boyer, Inc., later R.A. Boyer Associates), (2) F. Corrado and J. Corrado (affiliated with Corrado–American, Inc. ("Corrado–American")), (3) Iacono and Pettinaro (affiliated with Daisy Construction Company ("Daisy")), and (4) Kershaw and Stephen. A. Cole ("Cole") (affiliated with Kershaw Excavating Company ("Kershaw Excavating")).

The Stockholders Agreement also contained provisions relating to the further capitalization and governance of WMI. First, each shareholder group made an interest-free loan in the amount of $25,000, to serve as working capital for the corporation, and to be repaid as revenues became available and "under terms to be determined by the Board of Directors." The Agreement also required the stockholders to make additional, interest-bearing loans to WMI at the request of the board.[3]

Second, the Stockholders Agreement obligated each stockholder and the stockholders' affiliated companies to purchase all of their hot mix requirements from WMI. This reflected the understanding that WMI was to be a captive corporation, primarily servicing the needs of its owners for hot mix. Indeed, there was little effort made at any time thereafter to sell to third-party purchasers, and during the relevant period, third-party sales never exceeded 9% of gross sales.

3. Between 1987 and 1991, WMI's outstanding stockholder loans grew to $534,677. The first $100,000 of this amount was from the initial interest-free stockholder loans, and the remainder was provided by interest-bearing loans.

Third, the Stockholders Agreement reflected a decision to price the sale of hot mix products at a level at or near the prevailing market, creating the opportunity for WMI to earn profits. The agreement provided for a division of these potential profits between dividends (to be payable pro rata on the basis of stock ownership) and sales commissions (to be payable to the stockholders in proportion to sales to their affiliates and subcontractors).[4] One effect of this arrangement was that the affiliates paid market comparable rates for the hot mix while the stockholders themselves realized the profit (sales price less cost) through WMI dividends and commissions. Another effect was to compensate more highly those stockholders whose affiliates purchased more than their fair share of product from WMI.

Fourth, the Stockholders Agreement provided for a four member Board of Directors, consisting of one designee from each Stockholder Group, and for each stockholder to vote in favor of the election as a director of the designee of each other Stockholder Group. The records of the corporation reflect that the Board of Directors originally consisted of Boyer, J. Corrado, Cole and Iacono. On September 13, 1991, the Stockholders Agreement was amended to provide, *inter alia,* that every stockholder shall automatically be a member of the Board of Directors. At the time, this gave two directors to each Stockholder Group, the parties having agreed to admit Boyer's son as a stockholder transferee of one or more shares of stock held by Boyer.[5] This amendment also had the effect of making Kershaw a director.[6]

### 2. License Agreement

In order to begin operations, WMI needed a location for its hot mix plant. The Corrados offered to make space available on suitable land in which they owned an interest. Thus, Pettinaro and J. Corrado negotiated the terms of the Royalty and License Agreement (the "License Agreement"), dated May 26, 1991, between WMI and Delaware Residual Products, Inc. ("DRPI"), the owner of the land. Under that agreement WMI gained the right for a fifteen-year term "to install, maintain and operate ... asphalt hot mix manufacturing equipment" on land owned by DRPI in the Minquadale area of New Castle County, Delaware. The parties characterized this agreement as a license, rather than a lease, for reasons unrelated to the issues in this action. The License Agreement obligated WMI to pay DRPI $36,000 per year in years one through five, increasing to $48,000 in years six through ten and to $55,000 in years eleven through fifteen. At the time the License Agreement was signed, the Corrados were 50% stockholders of DRPI, J. Corrado also serving as its president and F. Corrado overseeing the day-to-day operations. J. Corrado signed the License Agreement on

---

4. Annual dividends were paid as declared by WMI's board. Between 1987 and 1991, dividends were paid in the amounts of: $403,994, $464,885, $172,459, $0, and $159,977, respectively. Commissions were payable to stockholder groups in accordance with the following formula: 55% of gross profits from sales to all stockholders multiplied by a fraction, the numerator of which is revenues from sales to the specific stockholder group and the denominator of which is revenues from sales to all stockholder groups. Commissions were treated as expenses on WMI's financial statements, thus reducing its profits. Between 1987 and 1991, commissions were paid in the total amounts of: $393,555, $522,246, $191,-145, $322,189, and $36,628, respectively.

5. For the purposes of this opinion, I find that Boyer never, in fact, made a complete gift of any of his shares to his son, notwithstanding his expressed intention to do so and the reference to his son becoming a stockholder in certain corporate records.

6. By September 1991, as is discussed *infra* at pages 11–12, Cole and Kershaw had developed irreconcilable differences and Kershaw Excavating Company was in dissolution. Kershaw began Kershaw Construction Company with the Corrados, not Cole, as his new partners.

behalf of both DRPI and WMI, as President.

### 3. Additional Capital

WMI's other capital requirements were met through working capital loans from Mellon Bank, guaranteed by defendants or their affiliates. The bank also required that WMI assign its rights under the License Agreement as security for the loans. Thus, WMI could not alter its residual rights in the License Agreement without Mellon's prior consent. As part of the assignment, DRPI covenanted that "it shall not conduct its affairs in any way which would interfere with the rights granted hereunder or in the [license] agreement to WMI or Mellon."

### 4. Early Successes Followed by a Reversal of Fortunes

The business fortunes of WMI, which were tied to the level of construction activity in the region, boomed in 1987 and 1988, faltered in 1989, recovered in 1990 and declined again in 1991. The gross sales for WMI are summarized between 1987 and 1991 in the following table. As can be seen, 1991 was a difficult year for all four Stockholder Groups. This was particularly the case for Boyer, whose business was teetering on the verge of bankruptcy, and for Kershaw and Cole, who wound up their business together with a public sale of assets for the benefit of creditors.

### Wilmington Materials, Inc.
### Selected Sales Information
### 1987-1991
### (in '000's of $)

| Year | Total (including third party sales and discounts) | Boyer | Corrado-American | Daisy | Kershaw |
|---|---|---|---|---|---|
| 1987 | 5,058 | 735 | 2,060 | 715 | 1,440 |
| 1988 | 6,226 | 1,029 | 1,672 | 1,458 | 1,837 |
| 1989 | 4,732 | 1,018 | 1,749 | 803 | 918 |
| 1990 | 7,181 | 1,270 | 2,112 | 1,910 | 1,277 |
| 1991 | 4,190 | 543 | 1,272 | 1,233 | 851 |

The profitability of operations also varied considerably over this period.[7] WMI made money in every year of operation other than 1991, when it lost money as the result of an inventory write-down approved in connection with the sale of assets addressed in this opinion.

### 5. Boyer's Persistent Slow Pay Practices

Boyer's firm was by far the slowest of the Stockholder Group affiliates to pay WMI for hot mix purchases. Over the 1987–91 period, his firm averaged 107 days to pay invoices over $10,000. By contrast, Corrado–American averaged 20 days, Dai-

---

7. See supra, note 4.

sy 42 days and Kershaw 66 days. At times, Boyer owed WMI more than $500,-000.

Ultimately, the Board of Directors took steps to reduce the level of Boyer's receivables, and in particular his aged receivables. By August 1990, the directors and stockholders (including Boyer) agreed to implement a new receivables policy.[8] In conjunction with the adoption of this policy, the stockholders entered into a Stock Pledge Agreement and also approved a new Valuation Agreement valuing the outstanding stock at $1,600,000, or $400,000 for each Stockholder Group. The effect of the interplay between the new policy and these agreements was that Boyer became obliged to maintain the amount of his aged receivables due WMI (i.e., the portion over 60 days) at less than $200,000 or risk losing his stock interest.

Notwithstanding these measures, Boyer's aged receivables due WMI continued to be a problem. On numerous occasions throughout the period October 1990 to March 1991, Iacono notified Boyer that the amount of his aged receivables exceeded $200,000 and that "unless the amount due is reduced below $200,000 within 10 days of the date of this letter, your Wilmington Materials, Inc. stock will be transferred to the Corporation." Typically, Boyer responded with a payment just adequate to reduce the amount of aged receivables below the level at which forfeiture was threatened. At trial, Iacono testified to the dissention within the body of stockholders caused by Boyer's inability or unwillingness to undertake to pay WMI in a more business-like manner and to his own distaste at being put in the position of having to dun Boyer regularly for payment.

In April 1991, the Board of Directors considered revisions to the accounts receivable policy designed to do the following: (a) freeze all distributions to any stockholder "whose account exceeds 90 days past due;" and (b) require all stockholders to pay balances within 90 days of the end of a calendar year. That policy was later embodied in a unanimous written consent of directors executed in May 1991. Also, on May 6, 1991, the stockholders signed a new "Designation of Company Value" fixing the value of WMI's shares at $800,000. This had the effect of lowering to $100,000 the point at which stock became subject to forfeiture for non-payment of accounts. It appears that Boyer made the final payment for his 1990 purchases on or about April 25, 1991. Despite the new policy, in 1991, Boyer paid only one invoice for more than $10,000 in fewer than 60 days.

### 6. Boyer Transfers His Business Operations to a New Entity

During 1991, R.A. Boyer, Inc. ceased operations and either sold or transferred its assets to a new entity known as R.A. Boyer Associates. Boyer took this step because a number of his customers were either paying very slowly or not paying at all due to their bankruptcy. As Boyer said at trial, "we were looking for a way to reorganize, change the image, start over without filing bankruptcy or whatever." Eventually, in 1994, R.A. Boyer Associates did file for bankruptcy.

### 7. Cole and Kershaw Develop Irreconcilable Disputes

By 1991, Cole and Kershaw had developed major business disagreements that led to the dissolution of Kershaw Excavating and the auction of most or all of its

---

**8.** This new policy contained the following elements: (1) all accounts to be paid within 60 days of purchase; (2) if an account aged beyond 60 days, all of the stockholder's stock to be pledged as security for its payment; (3) all amounts over 60 days old to bear interest at 18%; (3) if, at any time, the amount of accounts more than 60 days old exceeds one-

half the value of the pledged stock (as determined annually by agreement of the stockholders), the stockholder to have ten days to reduce the amount of such payables to one-half or less of the value of the pledged stock or forfeit all of the pledged stock in exchange for a reduction in amounts due equal to one-half the value thereof.

equipment. Kershaw formed a new corporation, Kershaw Construction Corporation ("Kershaw Construction"), in which he owned 51% of the stock and the Corrados owned the other 49%. According to Kershaw's testimony at trial, the Corrados paid no money for this stock interest. Rather, they assisted Kershaw in beginning his operations by leasing equipment to him on favorable terms. In 1992, Kershaw's new entity had gross revenues of approximately $3 million per year, as compared to approximately $20 million previously. Between 1993 and the time of trial, Kershaw (with the Corrados as his partners) did approximately $8–$10 million per year, or about half of the volume of business done by Kershaw Excavating before 1991.

### 8. Disputes About Pricing Policy

At trial, defendants took the position that WMI charged above-market prices on sales of hot mix to its stockholders. From this, they argued that the level of profits and distributions experienced by WMI and its stockholders between 1987 and 1990 were artificially inflated. The trial record did not support this position, showing instead that WMI priced sales of hot mix to its stockholders slightly below the level at which WMI sold hot mix to third parties and at or below the level the stockholders would have had to pay from other sources.

There were disputes among the stockholders about product pricing in 1991. Generally, prices were established at the beginning of each year by agreement among the stockholders, subject to the power of the President (or two other stockholders) to allow price reductions of up to 10% on request. 1990–91 was a period of intense competition for Daisy that caused Iacono to seek a general reduction in prices from the Board of Directors. While the Board apparently agreed to some price reduction, Iacono testified that Cole (and to a lesser extent Boyer) resisted the change because they wanted to maintain distributions at a higher level. Given the difficult environment, Iacono preferred lower prices to the possibility of receiving commissions and dividends at some time in the future depending on WMI's profitability.

### 9. DRPI/Sanifill Merger and the Holdback Agreement

In late 1990, the Corrados (and their partners) decided to sell DRPI and by May 1991 were negotiating terms of such a transaction with Sanifill, Inc. ("Sanifill"). On or about June 14, 1991, DRPI merged with and into Sanifill of Delaware, Inc., a wholly owned subsidiary of Sanifill, which subsidiary thereupon changed its name to DRPI ("DRPI II"). DM & H represented the Corrados and DRPI in the merger.

Sanifill planned to use the site of the WMI hot mix plant as part of its landfill operations and required, as a condition of the DRPI/Sanifill merger agreement ("Condition"), that WMI enter into an amendment to the License Agreement giving DRPI II the unilateral right to terminate the License Agreement on eighteen months notice. Specifically, this proposed amendment ("License Amendment") provided:

> [WMI] acknowledges that the Site of its hot mix asphalt plant will, at an as yet unknown time in the future, be used by DRPI as a part of its landfill operations on the Property. [WMI] agrees, that upon 18 months prior written notice from DRPI, delivered by DRPI to [WMI] ... [WMI] will, notwithstanding any other term in the License Agreement to the contrary, vacate the Site and remove all Equipment ...

The Corrados notified Mellon Bank of the proposed DRPI/Sanifill merger and on June 14, 1991, obtained Mellon's written consent to the License Amendment. For reasons never explained, the Corrados did not inform WMI of the proposed merger, nor did they ask WMI to consent to the License Amendment before the merger closed. Thus, at the time of closing, the Condition was not satisfied.

At closing, Sanifill refused to waive the Condition. Instead, it required the DRPI stockholders to enter into an agreement ("Holdback Agreement"), executed simultaneously with the closing of the merger, authorizing Sanifill to withhold $1.5 million of the merger consideration "in an interest bearing account," until such time as the sellers delivered to Sanifill the fully executed License Amendment, "with the consent of Mellon Bank attached thereto."

The Holdback Agreement created a significant interest on the part of the Corrados either to secure WMI's agreement to the License Amendment or to cause WMI to move its hot mix plant off the DRPI site. Moreover, the interest created by the Holdback Agreement was magnified by the imprecision of the terms of the escrow arrangement. That agreement did not appoint an independent escrow agent and did not specify even the rate of interest to be paid on the escrowed funds.

*10. The Corrados Develop a Plan to Move WMI*

Shortly after the closing, J. Corrado, acting in his capacity as Vice President of WMI but without the knowledge of the WMI Board of Directors, wrote to the Delaware Department of Natural Resources to request an amendment to WMI's operator permit to allow the corporation to relocate the plant to a site in Edgemoor that they determined was suitable for WMI's hot mix operations. The site was owned by Conrail Corporation and provided the opportunity to bring stone to the site by rail, a potential cost saving step. The Corrados also secured advice from the City of Wilmington that the proposed Edgemoor site was properly zoned for operation of a hot mix plant.

The Corrados first informed Boyer and the other WMI stockholders of the DRPI/Sanifill merger and the desire of DRPI II to amend the License Agreement in an August 12, 1991 letter that asked the stockholders to agree to a plan to relocate WMI to the Edgemoor site. This letter did not disclose the License Amendment's origin as a condition to the merger nor did it mention the Holdback Agreement. Rather, it said only that DRPI II had "requested that we agree" to the License Amendment. In short, the letter did not disclose the Corrados' interest in the action they were proposing. The letter also did not disclose that the Corrados had already obtained Mellon's consent to the License Amendment.

Other than Kershaw, none of the stockholders reacted favorably to the Corrados' proposal. Boyer wrote to Iacono, WMI's president, identifying the reasons for his objection. In this letter, Boyer suggested that the expenses for the relocation should be assumed by the stockholders favoring the move and that each non-consenting shareholder group should be compensated for the increased costs resulting from the relocation. Cole also wrote in opposition to the relocation. No formal board action was taken on the License Amendment or relocation proposal. Iacono testified that, when the decision to move or not was put before the stockholders, "it was tabled due to a variety of concerns ... voiced by the stockholders, including myself."

On September 6, 1991, J. Corrado distributed to the WMI stockholders a proposal by defendant DAI, a corporation controlled by the Corrados, for the establishment of a stone depot and hot mix plant by DAI and WMI at the Edgemoor site. At this time, DAI was owned by the Corrados and Kershaw. To meet some of the objections raised to the earlier proposal, the Corrados proposed that DAI absorb the costs of moving WMI's hot mix plant to Edgemoor. Evidently to force a hasty decision, the proposal was set to expire on September 11, 1991, only three business days later. No action was taken on it before it expired by its own terms. The September 6, 1991 proposal did not disclose the nature or extent of the Corrados' self-interest in securing WMI's agreement to the License Amendment and the relocation proposal.

### 11. Sale of Assets to Delaware Aggregates, Inc.

The failure of the relocation proposals gave rise to a new plan to cause WMI to sell substantially all its assets to DAI for relocation to the Edgemoor site. As part of this proposal, the Corrados also decided to eliminate Boyer and Cole from the enterprise. Although Iacono and Pettinaro initially disfavored the failed relocation proposals, the Corrados solicited their agreement to participate in DAI's acquisition. In any case, the Corrados and Kershaw owned only 37.5% of the stock and controlled only 3 out of 8 votes on the Board of Directors. Thus, the agreement of Iacono and Pettinaro as directors and stockholders of WMI was both necessary and sufficient to secure the approval of any plan designed to exclude Boyer and Cole.

Without authorization from the WMI Board of Directors, as a first step in carrying out the new plan, J. Corrado obtained estimates of the value of WMI's hot mix plant from two companies dealing in used asphalt formulating equipment, CMI Corporation and GenTec Equipment Company. The estimates for the plant, dated September 30 and October 3, respectively, ranged from $670,000 to $750,000. A later estimate by Giles & Ransome valued WMI's front-end loader at between $125,000 and $130,000. No estimate was obtained for the pile of "reclaimed asphalt pavement" ("RAP") owned by WMI that had been carried on its balance sheet at a value of $318,000, nor was the value of the License Agreement, if any, determined. The appraisals received were done strictly on an asset value basis, and do not reflect any separate consideration of the value of the stream of earnings generated by WMI's plant.

On October 7, 1991, the Corrados and Kershaw met with Manning of DM & H to discuss the new plan.[9] Following the meeting, DM & H prepared an extensive legal memorandum, dated October 17, 1991, analyzing the proposed WMI/DAI transaction. This memorandum noted the Corrados' interest in the Holdback Agreement and the conflicts arising from the common ownership of WMI and DAI. Consequently, DM & H advised that the transaction, if challenged, would be evaluated under the entire fairness standard. In this regard, the memorandum advised that the proponents of the plan should notice a meeting of stockholders, which "should be accompanied by a complete disclosure of all material facts concerning the proposed Asset Sale to DAI, including all interests of the Corrado Group in that transaction." Moreover, the memorandum reviewed Delaware valuation law and concluded that "unless another valuation method is customary in the paving materials industry, any appraisal relied upon by the Corrado Group should be based upon a capitalization of earnings model. In other words, any such appraisal should focus upon the average annual earnings of WMI for a reasonable period preceding the sale of its plant to DAI, and should capitalize those average earnings using a multiplier applicable to sales of comparable businesses." This memorandum was not distributed to Boyer, Cole, Iacono or Pettinaro.

DM & H was later asked to prepare a capitalized earnings analysis, although as a law firm it had no special qualification to do so. In a memorandum dated December 17, 1991, DM & H presented such a valuation analysis and arrived at a conclusion consistent with the appraisals rendered on an asset value basis. The defendants do not rely on DM & H's valuation analysis in this proceeding, and it is conceded to be defective. The second DM & H memorandum was also not distributed to Boyer, Cole, Iacono or Pettinaro, although Iacono believed that DM & H was representing

---

**9.** Manning's time records reflect that Iacono and Pettinaro were also present for this meeting. Iacono adamantly stated they were not. Assuming they were not, the record shows

that they were, in any event, already in discussion with the Corrados over the terms of their admission as stockholders of DAI.

WMI in connection with the proposed transaction.[10]

The December 17, 1991 DM & H memorandum also discussed a change in the anticipated procedure for obtaining approval of the WMI/DAI transaction. Rather than calling a meeting of stockholders, as discussed earlier, the December 17 memorandum confines itself to an analysis of the procedural requirements for calling a meeting of the Board of Directors.[11] It concludes that such a meeting can be called on five days notice without the need to "indicate that the proposed Asset Sale will be considered at the meeting" and without disclosing "the terms of the proposed sale." This memorandum was not distributed to Boyer, Cole, Iacono or Pettinaro.

On January 6, 1992, the directors of WMI, other than Boyer and Cole, met to discuss the plan for selling WMI's assets to DAI and for Iacono and Pettinaro becoming stockholders of DAI. Manning and Shauneen Hutchinson, Esquire, ("Hutchinson") an in-house attorney employed by Helicon, also attended the meeting. Boyer and Cole were not invited to attend. At this meeting, Manning laid out the process by which the sale of assets would occur. Iacono understood Manning to be speaking for WMI, of which Iacono was President and a director. The process described gave Iacono "an uncomfortable feeling" that prompted him to ask Manning if "what we were doing was legal and fair." Manning responded that it was. Hutchinson pre-

pared a memorandum summarizing this meeting. Among other things, this memorandum reflects significant elements of the agreement by which Iacono and Pettinaro were to become stockholders of DAI.

A special meeting of the WMI board of directors was held on January 14, 1992, to consider the proposed sale of assets. While this meeting was properly noticed, its purpose was not disclosed to Boyer or Cole. Immediately prior to the start of the meeting, private meetings were held between Boyer and Pettinaro, and Cole and Iacono, in which Boyer and Cole learned of the outline of the proposal and were told that the directors' approval of the proposal was a foregone conclusion. They also received copies of a letter, signed by Iacono, explaining that "the largest reason for the transaction is the business differences that have arisen between you and the other WMI stockholders concerning the relocation of the WMI plant, product pricing policy and financial support for WMI's business in these difficult times."

Shortly thereafter, the Board of Directors convened. The defendants followed a prepared agenda outlining the terms of the DAI proposal. No financial or legal advisors attended this meeting. There was limited discussion, and Boyer asked no questions. After reviewing the agenda items, the directors voted 5–3 to approve the sale. Boyer, his son, and Cole dissented. The Holdback Agreement was not discussed.[12]

---

10. Manning testifies that he represented only the Corrados. Iacono and Pettinaro testified that they believed that DM & H was also representing WMI in connection with the Asset Sale. Testimony at trial suggested that DM & H's fee for services rendered in connection with the transaction was paid by WMI.

11. In fact, a notice was sent for a special meeting of stockholders to be held on November 6, 1991 "for the purpose of considering and voting upon any matters that may come before the meeting." However, no meeting of stockholders was held on that date, nor was the noticed meeting ever formally adjourned

or cancelled. Rather, defendants proceeded by calling a meeting of the Board of Directors that, unlike the notice required under Section 271 of the DGCL, required no notice of the purpose of considering a proposal to sell all or substantially all the assets of WMI.

12. The only reference to the Holdback Agreement was the following language in the agenda, "[f]unds previously escrowed by [Sanifill] will be released to Butch & GoGo upon sale and relocation of WMI's plant." The credible testimony at trial leads me to conclude that there was no discussion of this item of the agenda.

The hot mix plant and the front loader were sold to DAI for $825,000. DAI also purchased the RAP material, at no additional cost, in exchange for DAI's assumption of costs relating to breaking up and transporting that material from the DRPI II site. DAI did not acquire WMI's accounts receivable (book value $937,000, net of reserve), certain other inventory items (approximately $100,000), the License Agreement (having no book value) or miscellaneous other assets (book value of approximately $100,000). DAI also did not assume WMI's obligations to Mellon on the bank debt ($1.4 million) or its other current liabilities (approximately $604,000). It is undisputed that, on a book value basis, the transaction rendered WMI insolvent.

The "fairness" of the terms of the transaction was supported by reference to the three asset appraisals. No reference was made at the time to the valuations of the stock made in 1990 ($1.6 million) and 1991 ($800,000). As an additional indicium of "fairness" to Boyer and Cole, DAI offered them each a 6% discount on future hot mix purchases, subject to mutually acceptable payment terms and in Boyer's case, a written requirements agreement.

The WMI board voted 5–3 to dissolve the corporation and, in connection with such dissolution, to convert into stock all the loans made to it by the shareholders, including loans from Boyer totaling $133,-669.[13] The resolution provided that the loans would not be repaid in cash, but would be treated as if they were converted into WMI common stock. Of course, due to the insolvency of WMI, it was not anticipated that the process of dissolution would lead to the distribution of any cash to Boyer and, in fact, he has received nothing for his interest in WMI.

Also on January 14, 1991, the five continuing stockholders signed a letter agreement, on DM & H letterhead, outlining their mutual obligation to attend the January 14th WMI Board of Directors meeting and the terms of their understanding by which Iacono and Pettinaro were each to acquire 20% of the outstanding shares of DAI. Notably, the letter reflected the parties' agreement to execute a stockholders agreement containing a super-majority voting provision preventing involuntary "freeze-outs." As reflected in later documents, the defendant directors also agreed to obligate themselves and their affiliates to purchase all of their hot mix requirements from DAI.

### 12. DAI to Continue WMI's Business

The record is abundantly clear that the defendant directors, in approving the sale of assets, intended DAI to be a continuation of WMI's hot mix operation, minus Boyer and Cole as stockholders. My review of the evidence also leads me to conclude that the directors who voted in favor of the Asset Sale regarded it as advantageous to DAI and would not have voted to approve it on the terms proposed if they had not been or expected to become stockholders of DAI.

### 13. Valuation of WMI by the Parties' Expert Witnesses

At trial, each party presented expert witness testimony on the value of WMI or, more precisely, Boyer's interest in WMI at the time of the Asset Sale. I will here summarize the relevant testimony of these experts.

#### a. Boyer's Expert Dr. Donald J. Puglisi

Boyer's expert, Dr. Donald J. Puglisi ("Dr.Puglisi"), employed a price/earning capitalized earnings approach for valuation purposes. Dr. Puglisi is the MBNA Amer-

---

**13.** There is a discrepancy as to the effective date of this conversion. The board resolution stated that the conversion was to be effective February 1, 1992, but financial statements prepared by Horty state that the conversion was effective January 1, 1991. Moreover, although the dissolution of WMI never occurred, defendants argue that the conversion of the loans was reaffirmed by non-unanimous written action of WMI's stockholders and directors.

ica Business Professor and Professor of Finance at the University of Delaware. He is also Managing Director of Puglisi & Associates, a firm that, among other things, provides expert litigation services. Dr. Puglisi has testified as a valuation expert in this and other courts on numerous occasions. In summary, Dr. Puglisi testified as to his opinion that, at the time of the transaction, the fair value of the stockholders' equity in WMI was $2.2 million, plus the value of nonoperating assets, and, thus, that Boyer's interest in WMI was worth $550,000 plus one-quarter of the value of those other assets.

In his report, Dr. Puglisi initially determined that, as of January 14, 1991, WMI was still a viable operating company and that "there is no justifiable financial reason to value WMI on any basis other than as an operating entity that is a going concern." In this regard, he specifically concluded that "net asset value" was not "an appropriate basis for valuing WMI." He next concluded that, because there were no projections of future cash flows prepared by or for WMI, the discounted cash flow ("DCF") technique of valuation was not available to determine WMI's value. Rather, because WMI had a history of operating profits (in all years other than 1991) and positive cash flow (in all years), he employed a capitalized earnings technique in which a price/earnings ratio ("P/E ratio") is derived from a group of comparable publicly-traded corporations and applied to corresponding earnings measurements for WMI to arrive at the value of WMI's equity.

Several steps were involved in the process employed by Dr. Puglisi to derive the appropriate P/E ratio. First, he decided to use as the price element in the ratio the total invested capital ("TIC") for each identified publicly traded company. TIC is measured by adding the total market capitalization of the company's equity to the fair market value of its interest bearing debt. Next, he decided to use as the earnings element in the P/E ratio each such company's earnings before interest, taxes, depreciation and amortization ("EBITDA"). This use of TIC and EBITDA as the numerator and denominator of the P/E ratio is sometimes referred to as the debt-free approach to valuation. It is a recognized way to eliminate, or at least make less important, differences in capital structure among the comparable companies chosen or between them and WMI.

Second, Dr. Puglisi selected three publicly traded companies judged by him to be comparable to WMI in the nature of their business and their reaction to economic factors. Using those companies, he then derived both the arithmetic and weighted average P/E ratios for the group and multiplied the lower of them (6.73x) by WMI's average and weighted average [14] EBITDA for the 1987–91 period ($539,400 and $496,800, respectively). The result represents the fair value of WMI's TIC. Dr. Puglisi then subtracted WMI's interest bearing debt ($1,415,463) from the TIC derived for WMI to calculate the fair value of the stockholder's equity. As stated above, he concluded that the fair value of WMI's shares at the time of the transaction (without regard to the value of nonoperating assets) was $2.2 million (using the arithmetic average of EBITDA) or $550,000 for Boyer's 25% interest. Using the *weighted* average EBITDA, the results were $1.93 million total value, or $482,500 for Boyer's interest.

### b. Defendants' Expert, Mr. J. Mark Penny.

Defendants' valuation expert was Mr. J. Mark Penny ("Penny"). Penny is a Managing Director of Hempsted & Co., Inc.,

---

**14.** Because Dr. Puglisi used 5 years of earnings in his analysis, weighted average EBITDA was derived by multiplying EBITDA for the most recent year (1991) by 5, the next prior year (1990) by 4, 1989 by 3, 1988 by 2 and 1987 by 1, adding the results together and dividing by 15, the sum of the integers, 5, 4, 3, 2, and 1. This process has the effect of weighing more heavily WMI's depressed 1991 earnings.

a financial consulting company that specializes in valuation consulting, litigation support and mergers and acquisitions advisory services. Penny is an Accredited Senior Appraiser in the American Society of Appraisers.

Penny testified to his opinion that the fair market value of the stock of WMI, at the date of the transaction, was "negligible, or zero, because the liabilities [were] in excess of the asset values." In essence, Penny's opinion was predicated on the three appraisals of plant and equipment obtained by the Corrados in connection with the transaction. By adjusting WMI's book value to reflect the fair market values derived from those appraisals, Penny testified that the WMI's net asset value was less than zero (i.e.,—$130,000).

A crucial aspect of Penny's opinion was his conclusion that other, customarily employed methods of valuation were not properly employed in valuing WMI. Thus, he stated that, before settling on a net asset value approach as the *only* appropriate method for valuing WMI, he first considered and rejected both the approach employed by Dr. Puglisi, and a DCF analysis. Penny did not disagree with the mechanics of the approach in Dr. Puglisi's report, saying "I would pretty much do it the same way, if I chose to use that approach." He also acknowledged that the approach employed by Dr. Puglisi is one "frequently used in the field of valuation." Nevertheless, Penny testified, this approach was not an appropriate method to value WMI, fundamentally for two reasons.

First, he testified that he did not believe it was possible to locate publicly traded companies comparable to WMI. He searched but "did not locate any companies that [h]e considered would be deemed to be useful by investors in the valuation of Wilmington Materials, generally, because the companies were either significantly larger or in diversified areas of business, or were significantly different in terms of profitability or cost structure."

Second, Penny concluded that "an investor could [not] be induced to make an investment in [WMI] based on" a capitalized earnings approach because "an investor would [not] perceive [WMI's historic] earnings capability to be immediately replicable." The reasons supporting Penny's conclusions in this regard were as follows: (1) WMI had suffered a serious decline in earnings in 1991 (from a $300,000 profit to a $300,000 loss), (2) the situation inside the company was tumultuous and (3) the general economy was in a state of recession.

In contrast, Penny believed that an asset-based approach was appropriate for two reasons; first, the value of the equipment is related to the earning capability of the equipment and second, WMI's debt and erratic earnings made it more likely that an investor would choose to purchase a comparable piece of equipment and replicate WMI's business than to invest in or purchase WMI.

### 14. Valuation of the License Agreement and the RAP Material

In addition to a determination of the fair value of WMI, two other valuations are also at issue in this matter, the License Agreement and the RAP Material.

#### a. Valuation of the License Agreement

In the transaction at issue, DAI did not acquire the License Agreement, and no consideration was paid to WMI for either its consent to the License Amendment or to its abandonment of the premises. Boyer contends that the License Agreement had value beyond its contribution to WMI's operations. At trial, Boyer presented testimony from Mr. David J. Wilk ("Wilk"), the owner of Greystone Realty Advisors, a real estate consulting and advisory company, and an adjunct professor of real estate finance at the University of Delaware. Wilk is an MAI (Member of the Appraisal Institute) and a Senior Member of the American Society of Appraisers. Wilk opined that the License

Agreement had a value of between $450,000 and $500,000.

Wilk relied primarily on a method of valuation known as the "beneficial leasehold analysis." The central premise of this analysis is that, as a result of the DRPI/Sanifill Merger and the Holdback Agreement, WMI (which held a 10 year possessory interest in the property) had the opportunity to extract a payment in exchange for its agreement to the License Amendment or to move its operations. Wilk measures the value of this opportunity as equal to the difference in value between the stream of rental payments due under the License and the stream of rental payments that could be obtained by putting the property to use as a landfill, its highest and best use. Wilk performed both a Sales Comparison and Income Approach to value WMI's interest in the property in this way.[15]

Wilk's report shows, at various places, that the force of his analysis depends on WMI's ability to make use of the site as a landfill or to sublease the property to some other entity for that purpose. In fact, the License Agreement limited WMI's use of the property to the operation of a hot mix site and Boyer has not established that WMI had the right, under the License, to make use of the property for the purpose of operating a landfill or to sublease it to another for such a purpose. Indeed, it would be extraordinary if WMI did have the right to so radically change the condition of the property without that right being identified specifically in the Agreement.

The record also shows that Iacono and Pettinaro understood that WMI's right to maintain its operations on the Minquadale site for a period of ten years gave them the power to bargain with the Corrados

over the terms on which they would agree to move the hot mix operation. They bargained to have the Corrados pay to move the plant and for other terms that were at least as advantageous to them as those enjoyed by WMI. Iacono did not believe that it was appropriate to extract additional payment from the Corrados and, although he was unaware of the magnitude of the Holdback, rejected the idea of asking the Corrados to share the Holdback payment with WMI or its stockholders.

### b. Valuation of the RAP Pile

As of January 14, 1999, WMI owned 58,000 tons of reclaimed asphalt pavement, or RAP, that was valued at approximately $318,000 on the company's preliminary December 31, 1991 balance sheet. The value of the RAP pile was completely written off in conjunction with the January 14, 1992 Asset Sale. Boyer contends that WMI is owed the value of the RAP pile as of January 14, 1992.

RAP, like hot mix, consists of two main products: liquid asphalt and stone aggregate. These products are, of course, valuable in their virgin state, and when RAP is crushed, their value can be realized by using a portion of crushed RAP in lieu of virgin material in producing hot mix. Crushed RAP can also be used as sub-base in the construction of roads or parking areas in lieu of stone aggregate.

WMI obtained RAP in the course of its operations or those of its affiliated entities. RAP has a tendency to harden when left standing or piled up, and, over time, WMI's RAP pile grew quite large and hard. The poor condition of the RAP pile made it difficult for WMI to realize the value of the RAP it accumulated. To use it profitably, WMI needed to find a way to

15. Wilk also performed a "supplemental" analysis which measured the value of WMI's interest as the difference between the value of the fee simple to Sanifill ($1.5 million, as measured by the Holdback) and the value of DRPI's "leased fee interest", i.e., the capitalized value of the License Agreement plus the value of the fee interest after the conclusion of the 10 year remaining term of the License Agreement. This analysis was said to result in a value of $500,000 to $600,000, but was referred to by Wilk only as indicating the reasonableness of his primary approach.

rip apart the pile and run the material through a crusher. Iacono testified at trial that he attempted to manage the use of the RAP without success, as he had not found an economical way to rip and crush the material.

Nevertheless, WMI carried the RAP on its balance sheet at a value of approximately $5.40 per ton. This value was calculated, by subtracting from the value of the raw materials comprising the RAP (approximately $11.40 per ton), an estimate of the cost of ripping and crushing the material to render it useful (approximately $6.00 per ton.) Iacono's testimony suggested that the carrying value of the RAP overstated its value to WMI and that, as of January 14, 1992, the RAP pile had no value to WMI. At trial, Boyer presented expert evidence that the cost of crushing RAP is between $4.00 and $5.00 per ton. Boyer's expert did not separately estimate the cost of ripping the RAP pile or carting the material to and from a crusher.

As previously noted, WMI's RAP material was acquired by DAI, at no cost, in exchange for DAI's assumption of all costs relating to the materials' break-up and transportation from the DRPI II site. The terms of this transaction were fixed by the defendants in discussions among themselves. They did not solicit bids for the RAP or seek an appraisal of the material from anyone having experience in valuing RAP material. Moreover, Iacono testified that DAI did not move the material from DRPI II's property following the 1992 transaction. Instead the material was slowly consumed over the next few years by Corrado–American, or used by DRPI II as sub-base in building roads at the landfill site.

## II. DISCUSSION

Having set forth the factual and procedural background of this action, I turn to a discussion of the merits. The issues for trial were narrowed by this Court's earlier summary judgment decision. I am now asked to make a determination with regard to two questions: (1) whether defendants have shown that the sale of WMI to DAI was an entirely fair transaction and (2) whether defendants improperly and without authorization converted Boyer's stockholder loans into stockholder equity. In addition, I must also address defendant J. Corrado's counterclaim seeking a ruling as to whether he is entitled to indemnification from Boyer for monies he paid to Mellon to satisfy WMI debt.

## A. Was the Sale of WMI to DAI Entirely Fair?

### 1. Standard of Review

It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have "the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983) ("There is no 'safe harbor' for such divided loyalties in Delaware."). Directors will be found to have acted with entire fairness where they "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Id.* This is clearly a case where the defendant directors of WMI stood on both sides of the transaction. Indeed, defendants concede that it was their burden at trial to prove that their conduct satisfied the entire fairness standard.

The concept of entire fairness has two components: fair dealing and fair price. *See Weinberger*, Del.Supr., 457 A.2d at 711. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* In making a determination as to the entire

fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole. *Id.*

Before I turn to the specifics of the analysis, it is useful to state that the form of the January 14, 1992 transaction—a sale of assets to a related entity for the purpose of carrying on the same business—gives rise to some difficulty in analyzing the fairness of its terms. The transaction reflects two distinct objectives in its structure and timing. The first objective was the Corrados' desire to secure the release of the $1,500,000 Holdback by getting WMI to agree to relocate. The accomplishment of this objective required only the approval of a majority of the Board to Directors to a proposal to move WMI's plant and operations. The second objective was the elimination of Boyer and Cole from participation as stockholders in the continuing entity. The accomplishment of this objective did not require any change in WMI's assets or the location of its operations, only in its ownership structure. In other words, a decision to cash-out Boyer and Cole by merger could have been implemented without otherwise disturbing the organization or operations of WMI.

For reasons that the defendants do not explain, when these two objectives converged in the proposal acted on at the January 14, 1992 meeting, the structure proposed had a more radical impact on WMI than was required to meet either objective. The proposal was to sell WMI's operating assets and move those assets, but not WMI itself, and to put an end to WMI's business, not just to Boyer's and Cole's participation in it. That is, rather than proposing that WMI move to Edgemoor and continue its business without Boyer and Cole (by, for example, effecting a cash-out merger), the defendants decided to sell WMI's plant and equipment to themselves and to abandon WMI's business without affecting the stock ownership interests in WMI.

This structure was not, of course, inherently "unfair" to WMI or Boyer. Directors of Delaware corporations may approve a sale of corporate assets and a dissolution of the corporate enterprise in appropriate circumstances and on appropriate terms. *See* 8 *Del.C.* §§ 271, 275. However, the fairness to Boyer of the transaction approved by the defendants must be judged in relation to the overall impact on WMI and the value of Boyer's interest in WMI. The sale of the plant and equipment, by design, made WMI incapable of producing hot mix and, thus, incapable of holding the defendants to their contractual obligations to purchase their hot mix requirements from WMI. Instead, defendants agreed to bind themselves by contract to purchase their hot mix requirements from their new entity. Moreover, WMI had no tangible asset value after January 14, 1992, as it had been rendered insolvent as a result of the January 14, 1992 transaction. As a consequence of the actions taken by the defendants, WMI's value as a going concern was destroyed. The indirect effect on Boyer of the changes in WMI was to deprive him of whatever value his shares in WMI held before the transaction.

### 2. Fair Dealing

The duty to deal fairly requires the fiduciary "not to time or structure the transaction, or to manipulate the corporation's value, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price." *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, Del.Ch., 532 A.2d 1324, 1335 (1987). Directors must make an "informed, deliberate judgment, in good faith," that the transaction is fair and not a "vehicle for economic oppression." *Id.* In addition, directors are required to disclose all material facts concerning the transaction so that an informed decision can be made as to whether or not a transaction should be approved. *Id.*

In their post-trial brief, defendants bravely argue that the "record is replete with evidence that the process by which the Asset Sale transaction was completed was entirely fair." To support their position, defendants point to the following factors:

— DM & H prepared two memoranda "explaining the duties and responsibilities of directors in sales of assets, analyzing the facts and creating the framework for the entire fairness of the Asset Sale."

— The January 14, 1992 meeting of the Board of Directors was duly called and "notice of the meeting was sent to all Stockholders of WMI in advance of the meeting in compliance with Delaware law and WMI's bylaws."

— At the January 14, 1992 meeting, a written proposal for the Asset Sale was presented and the Board "reviewed and considered the desirability of proceeding with the transaction, the reasons for the transaction, the price of the transaction and all other pertinent issues concerning the proposed Asset Sale."

— At the January 14, 1992 meeting, there was full disclosure of the terms of the proposed transaction "including the interests of the directors involved in the Asset Sale transaction."

— A majority of the Board of Directors voted to approve the transaction and, thereafter, a majority of the stockholders executed a written consent approving the transaction.

The defendants argue, in short, that "the entire procedure was consistent with the bylaws of WMI, the Stockholders Agreement and Delaware law, and thus the process was entirely fair to WMI and its Stockholders."

▇▇▇ I cannot agree. While it may be true that the procedure employed by the defendants complied with the mechanical requirements of WMI's bylaws, the Stockholders Agreement and Delaware law, for calling a meeting of directors, that hardly is sufficient to show the procedural fairness of the transaction. Nor does the fact that the transaction was approved by a majority of the Board of Directors or a majority of the stockholders establish fairness, as every vote in favor was cast by an interested person. Moreover, that DM & H produced two memoranda discussing the application of Delaware law to the proposed transaction does nothing to support a finding of procedural fairness, if for no reason other than that DM & H did so as counsel to the Corrados and that neither of those memoranda was given to the Board of Directors. Not even Iacono or Pettinaro, who believed they were represented by DM & H, received copies. DM & H's analysis was also not shared orally with the Board of Directors, and no representative of that firm attended the January 14, 1992 board meeting.

▇▇▇ In my view, there are ample other matters relating to the initiation, negotiation and approval of the WMI/DAI transaction that preclude a finding of fair dealing.

The original impetus for the January 14, 1992 transaction came from the Holdback Agreement and the Corrados' desire to secure the release of their funds from escrow. As early as June 1991, the Corrados caused WMI to seek operating permit amendments and relocation cost estimates without first obtaining the authority to do so from the WMI Board of Directors. The Corrados then made proposals to move WMI's operations to Edgemoor, in which proposals they failed to disclose their interest to their fellow stockholders. When these proposals failed, the Corrados and DM & H began to analyze a sale of assets. Although DM & H was counsel to WMI, neither DM & H nor the Corrados sought the consent of WMI for its involvement in this activity. The Corrados obtained ap-

praisals of WMI's assets, a process that required the appraisers to come onto WMI's property to make a visual inspection of its plant and equipment. DM & H obtained internal WMI financial information and access to persons knowledgeable about WMI's affairs for the purpose of advising the Corrados about the fairness of their proposal.

The terms of the proposal were established without any negotiation on behalf of WMI, which had neither independent legal nor independent financial advice. The only negotiation involved in the transaction was among the defendants over the terms of their joint ownership of DAL. Even when DM & H advised the Corrados that WMI should be valued on a going concern basis, the Corrados failed to hire an expert in the field of corporate valuation, turning instead to DM & H to conduct the analysis.[16]

The record also supports the conclusion that the defendants actively sought to keep Boyer uninformed about their plans until January 14, 1992. Certainly, he was not informed of or invited to participate in the earlier meeting held on January 6 to discuss the sale. Moreover, the notice given for the January 14, 1992 board meeting contained no mention of its purpose to consider a proposal to sell assets. I conclude from the second DM & H memorandum and Manning's trial testimony that this omission was made intentionally to prolong Boyer's state of ignorance and to deprive him of the opportunity to take action to protect his interests before that meeting was held and the transaction approved. I also find that the Corrados never informed the Board of Directors of the terms of the Holdback or their interest in securing WMI's agreement to the License Amendment. This failure would appear to have deprived Boyer and the other directors of the opportunity to negotiate better terms for WMI.

Finally, the record suggests that, in approving the transaction, the WMI board failed to consider, among other things, the earnings potential of WMI based on past sales, the value of the RAP material, the possible value of the License Agreement, and the likelihood of securing, in the near future, a substantial contract under negotiation at the time of the sale.[17]

In sum, I conclude that the defendants have failed to show that the challenged transaction was the product of fair dealing.

### 3. Fair Price

Defendants have also not carried their burden of proving that the price terms of the transaction were fair.

 It is apparent to me that, while WMI experienced significant internal troubles in 1991, it remained a viable enterprise with substantial going concern value. The source of that value was not limited to the physical machinery and equipment with which it produced hot mix. Rather, WMI's value also derived importantly from the contractual obligations of the Stockholder Groups to purchase their hot mix requirements from WMI and from the 10–year remaining term of the License, among other things. By the end of 1991, at least two stockholders remained financially strong and there were prospects of increased sales to third parties. In addition, WMI continued to generate positive

---

**16.** I also note that the conditions for approval of the transaction do not lend weight to defendants' claim that they employed fair procedures. The defendants' proposal did not require for its approval anything other than a simple majority vote of either the directors or the stockholders. Of course, a majority of the votes at both levels were controlled by and cast by the defendants themselves.

**17.** In late 1991 or early 1992, J. Corrado had discussions with representatives of Cherry Hill Construction, at the time a bidder on the 1495 repaving contract. Cherry Hill was awarded the contract and subsequent to this award, in April 1992, Cherry Hill and DAI entered into a contract by which DAI provided Cherry Hill with stone, hot mix and a portion of property on which Cherry Hill could locate its portable ready-mix concrete plant.

cash flow, even in 1991. Thus, I accept Dr. Puglisi's testimony that there is no reasonable basis on which to value WMI other than as a going concern.

The price paid by the defendants does not reflect WMI's going concern value and, for that reason, is not fair. The transaction approved by the defendant directors destroyed the value of the requirements contracts and caused WMI to surrender the License Amendment for no consideration.[18] Yet, the appraisals obtained in connection with that transaction and relied on by the director defendants relate exclusively to the value of the physical plant and equipment. Neither those appraisals nor the defendants ascribed any value to WMI's business or money-making capacity.

At trial, Penny tried to breathe life into the defendants' pricing decisions by his testimony that the fair value of WMI (as a whole) as of January 14, 1992 was no more than, and perhaps less than, the amount DAI paid to purchase the hot mix plant and front-end loader. This was so, he said, because the net asset value of WMI (adjusted for the appraised value of those pieces of equipment) was zero or less than zero. I reject Penny's testimony because, like defendants' pricing decision at the time of the transaction, it is premised on a view that WMI had no ascertainable going concern value. As I have said, this is a premise I cannot accept. WMI had a history of earnings and positive cash flow and, although weakened by the downturn in the business cycle and internal dissention, continued to possess the characteristics of a going concern at the time of the January 14, 1992 transaction. It cannot be valued properly without giving due consideration to its profit making potential.[19]

In rejecting Penny's valuation approach, I am reminded of Chancellor Chandler's remarks in *Neal v. Alabama By–Products Corporation,* as follows:

> If corporate fiduciaries engage in self-dealing and fix the . . . price by procedures not calculated to yield a fair price, these facts should, and will, be considered in assessing the credibility of [their] valuation contentions.

Del.Ch., C.A. No. 8282, 1990 WL 109243, Chandler, V.C., mem. op. at 11 (Aug. 1, 1990), *aff'd,* Del.Supr., 588 A.2d 255 (1991).

\* \* \*

For these reasons, I find that the defendants have failed to carry their burden of proving the entire fairness of the January 14, 1992 transaction.

## B. To What Relief Is Boyer Entitled?

In his individual capacity, Boyer requests the following relief: (1) his pro rata share, as of January 14, 1992, of the fair value of WMI, the License Agreement and the RAP material, (2) his stockholder loans of $25,000 (initial) and $108,669 (additional) and (3) damages for the stockholder commissions he lost as a result of the Asset Sale. In his capacity as the derivative representative, Boyer seeks disgorgement or restitution of the $750,000 portion of the Holdback paid to the Corrados upon WMI's consent to the License Amendment, or the excess of the fair value of the License Agreement as determined by this Court.

 Where a shareholder has suffered special injury resulting from a fiduciary's failure to ensure that a sale of the

---

18. While I refer to these facts only in connection with my analysis of the fairness of the price terms of the transaction, they can also be viewed as bearing significantly on the fairness of the process employed. Defendants purported only to be buying and selling tangible assets of WMI when, in fact, they were pursuing a plan to destroy WMI's value as an ongoing business. The non-price elements of that plan affect the fairness of both the process followed and the price paid.

19. I reject Penny's suggestion that the appraisals of WMI's plant and equipment reflected an element of going concern value. Those appraisals reflect only the value of that equipment on the second hand market, considering their location, age and condition.

corporation was entirely fair, such shareholder is entitled to relief. *See generally In re Tri–Star Pictures, Inc., Litig.*, Del. Supr., 634 A.2d 319 (1993). Special injury is established:

> [W]here there is a wrong suffered by plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote.

*Id.* at 330. Boyer contends that he "suffered special injury because the controlling stockholders gained the benefit of manipulated asset values at his expense," and he was left "with his 25% interest in WMI, a worthless company, while defendants purchased the hot mix plant at an unfair price and simply continued WMI's business at a new location under a new corporate name."

■ That Boyer suffered an injury distinct from that of defendants is clear and requires little discussion. Defendants' unfair actions deprived Boyer of his fair share of WMI, an injury that only he (and Cole) suffered, as defendants continued the business through DAI. Thus, I now turn to each of Boyer's requests for relief.

*1. The Fair Value of WMI, the Remaining Term of the License Agreement and the RAP Material*

*a. The Fair Value of WMI*

■ Dr. Puglisi's capitalized earnings valuation derived a fair value of $2.2 million for WMI, as of December 31, 1991. He arrived at this conclusion by applying a P/E ratio of 6.73 (derived by a comparable companies analysis) to WMI's 5–year arithmetic average EBITDA. Relying on this testimony, Boyer contends that the fair value of his 25 % interest in the company's operating business was approximately $550,000. When Puglisi used the weighted average EBITDA instead, he calculated the value of Boyer's 25 % interest at $482,500.

As discussed earlier in this opinion, the defendants' objection to Dr. Puglisi's analysis is limited. First, they contend that WMI was not a going concern and should be valued only on a net asset value basis. For reasons already explained, I reject this contention. Next, defendants take issue with the process by which Dr. Puglisi derived the P/E ratio used in his analysis. They argue that the significant differences between WMI and each of the three "comparables" chosen by Puglisi make his "valuation, based as it is upon a comparison with corporations bearing no relationship to WMI ... invalid as a matter of law." Quoting *In re Radiology Associates, Inc. Litigation*, DelCh., 611 A.2d 485, 490 (1991), they argue that the "utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison."

In *Radiology Associates*, the Court had available to it other methods for estimating the subject company's value as a going concern. In particular, there were reliable projections of future cash flows that enabled the parties' experts and the Court to engage in a DCF analysis. By contrast, no DCF analysis is possible here. Instead, the capitalized earnings analysis relied on by Dr. Puglisi is the only income-based approach presented to me. For this reason alone, I would hesitate to reject Dr. Puglisi's entire method of analysis merely because the process of deriving a P/E ratio may be more than normally imprecise. In addition, it appears from the Chancellor's opinion in *Radiology Associates* that the "comparable company analysis" presented by plaintiff's expert may have been substantially different from the capitalized earnings approach employed by Dr. Puglisi here. Rather than rely on information about comparable companies only as a means to derive a P/E ratio, the expert there sought to "calculate[ ] the value of the company through the use of earnings and other multiples." *Id.* at 489.

In my view, the obvious lack of significant "comparability" in terms of size, product mix, geographic market and capital structure between WMI and Dr. Puglisi's

"comparables" goes to the weight I will give to the P/E ratio derived by him, but it does not preclude the use of the capitalized earnings method—the only earnings-based approach available to me—as the significant determinant of value. The question, then, is whether to use Dr. Puglisi's 6.73x P/E ratio, whether to apply some discount to that ratio to account for the obvious and substantial differences between WMI and the companies chosen by him as being comparable, or whether to use some other multiplier. *See generally Gonsalves v. Straight Arrow Publishers, Inc.*, Del.Supr., 701 A.2d 357, 360 (1997) ("The modern appraisal process presumes a sophisticated judge who exercises independence in determining the value of [a] corporation in a contested proceeding.").

Defendants, in their post-trial brief, recommend that I use, instead, the 3x, 4x and 5x range of P/E multiples employed by DM & H in its December 17, 1991 discussion of WMI's "going concern" valuation. Without citation to any record evidence, defendants argue that "[t]here is every reason to believe that these multiples are far more realistic than the 6.73 P/E multiple computed by Dr. Puglisi." More pertinently, defendants suggest that the 3x – 5x range was also used by Horty (which, unlike DM & H, does have valuation expertise) when it prepared a valuation of WMI based as of December 31, 1987. However, that valuation was done on a very different basis than that employed by Dr. Puglisi, and its conclusions are not relied upon by any party to this litigation. Thus, there is no reliable basis to extract from it a range of multipliers. Finally, defendants argue that "adequate downward adjustment to any multiples should be made to take into account the obvious and severe economic and managerial problems encountered by WMI in 1991."

I conclude that internal conditions peculiar to WMI at the time of the challenged transaction do require me to apply some discount to the values derived by application of Dr. Puglisi's valuation approach. While it may be assumed that WMI and the "comparables" were exposed to the same general economic forces and conditions, there is no reason to believe that the "comparables" faced internal operational problems of the nature or severity confronting WMI. Thus, in my view, a person considering an acquisition of WMI in January 1992 would have had reason to question WMI's ability to replicate its history of 5-year earnings. Such a person would also have recognized that WMI had no net asset or liquidation value to fall back on in the event the expected revenues did not materialize from sales to the Stockholder Groups.[20] While I recognize that the obligation of the members of the Stockholder Groups to purchase their hot mix requirements from WMI provided WMI with an unusual measure of stability, the disarray within that group certainly had a negative impact on the value of the corporate enterprise.

To account for the peculiar, negative characteristics of WMI, I have considered discounts to Dr. Puglisi's P/E ratio of between 20% and 30%. *See Gilbert v. MPM Enterprises, Inc.*, Del.Ch., 709 A.2d 663, 672 (1997) (accepting expert's 12% premium to multiple to account for subject company's superior performance). I am persuaded that no greater level of discount is warranted by the facts of record. *See Gonsalves*, Del.Supr., 701 A.2d at 361 (noting this Court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action"); *Cooper v. Pabst Brewing Co.*, Del. Ch., C.A. No. 7244, 1993 WL 208763, Hart-

---

**20.** It should be noted that I reject defendants' suggestion that I should value WMI as though it were sold without the benefit of the requirements contracts found in the Stockholders Agreement. It is enough to note that defendants replicated these obligations in the new

entity formed by them. In my view, for the purposes of assessing damages resulting from the defendants' breach of fiduciary duty, WMI must be valued with those requirements provisions in place.

nett, V.C., mem. op. at 20 (June 8, 1993) (noting that in cases where "none of the parties establish[ ] a value that is persuasive, the Court must make a determination based upon its own analysis"). These discounts yield P/E ratios of 5.38(20%) and 4.71(30%). I will use the midpoint of these values, 5.05, to compute Boyer's damages resulting from the destruction of the value of his WMI shares.

I next determine that I will use the average EBITDA figure ($539,397), rather than the weighted average ($496,800). In my opinion, the average better represents the expected results of operations over the full business cycle. Moreover, in view of my decision to discount Dr. Puglisi's P/E ratio to account for the unusual problems confronting the Company in 1991–92, I see no reason to give even greater weight to 1991 results in my analysis.

For the foregoing reasons, I find that Boyer suffered damages as a result of defendants' approval of the January 14, 1992 transaction and the concomitant destruction of the value of Boyer's WMI shares equal to $327,000.[21]

### b. The Fair Value of the License Agreement

■ As previously discussed, Boyer presented expert testimony at trial to the effect that WMI's interest in the remaining term of the License Agreement had a value of $450,000 to $500,000. Although advocating his trial expert's analysis as an appropriate guideline amount, Boyer contends that he is entitled to his pro rata share, i.e. 25 %, of whatever amount this Court determines to be the fair value of the remaining 10–year term of the License Agreement.

As Dr. Puglisi recognized, and as is necessarily true, the value of the License Agreement as an operating asset of WMI is fully accounted for in the capitalized

earnings analysis. Moreover, the premise of defendants' expert's testimony was that WMI could realize the value of its "beneficial" leasehold by subleasing to another for the purpose of operating a landfill. The terms of the License Agreement do not support this premise. The only other measure of value of the License Agreement arises from the creation of the Holdback and the opportunity to extract a premium from the owners of DRPI (the Corrados and their partners) in return for WMI's consent to the License Amendment. I address this issue separately in Part II.B.2, below.

### c. The Fair Value of the RAP Material

■ Boyer contends that the fair value of the RAP in WMI's possession on January 14, 1992 was $318,000, the amount at which that material was valued on WMI's balance sheet before the write-off approved in connection with the January 14, 1992 transaction. Defendants do not address the issue of the RAP material in their post-trial brief. However, at trial, they presented evidence tending to refute WMI's balance sheet valuation and suggesting that the RAP had no value to WMI. Notably, Iacono testified to the problems WMI encountered when it tried to rip and crush the RAP material for use in its hot mix operation.

After reviewing the record, including the expert testimony introduced at trial by Boyer, I conclude that the RAP material had value at the time of the transaction. Nevertheless, in view of the poor condition of the pile and the difficulties encountered by WMI in its use, I cannot conclude that the material is appropriately valued at $318,000 for purposes of this litigation. If the RAP had been worth such a large amount, all of the WMI stockholders, including Boyer, would have pressed for a way to realize that value long before Janu-

---

**21.** Calculated as follows: [(5.05 × $539,400) − $1,415,463] × .25 = $327,126.75, or $327,000, rounded to the nearest thousand dollars. In this equation, 5.05 is the P/E multiplier, $539,400 is the average 5–year EBITDA and $1,415,463 is the amount of interest-bearing debt.

ary 1992. Rather, recognizing that the difficulty in valuing the RAP is due largely to the defendants' failure to secure a reliable appraisal of the RAP at the time of the transaction, I will calculate the value of the RAP by adjusting the estimated cost of crushing ($6.00 per ton) to include an additional $2.00 per ton for ripping and transporting the RAP to a crusher. This reduces the residual value of the RAP to $3.40 per ton, or a total of $197,200.

Thus, Boyer is entitled to his pro rata share (25%) of this amount, which equals $49,300, plus interest. The appropriate interest rate is discussed, *infra*, at Part II.B.4.

### 2. Disgorgement of the Holdback

In his derivative capacity, Boyer requests relief for WMI in the form of disgorgement of the Holdback received by the Corrados after WMI's execution of the License Amendment. Boyer bases his claim for disgorgement on the theory that the Corrados breached their fiduciary duties to WMI in seeking and obtaining WMI's consent to the License Amendment and, thus, cannot benefit monetarily from that breach. In pressing this claim, Boyer relies principally on the decisions of the Delaware Supreme Court in *Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436 (1996) and *Oberly v. Kirby*, Del.Supr., 592 A.2d 445 (1991).

In *Oberly v. Kirby*, the Delaware Supreme Court broadly condemned acts by fiduciaries to profit personally from their fiduciary relationship, stating:

It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary. The result is nonetheless one of unjust enrichment which will not be countenanced by a Court of Equity.

Del.Supr., 592 A.2d at 463.

The Supreme Court said the following in *Thorpe* concerning the proper scope of damages for breach of the duty of loyalty:

Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly. Although this Court in *In re Tri-Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319 (1993) was addressing disclosure violations, we reasoned from a more general standard concerning the duty of loyalty:

"[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position.... The distinction we noted in *Oberly* [between personal profit and injury to the corporation] explains why no Delaware court has extended the damage rule to actions for breach of fiduciary duty...."

*In re Tri-Star Pictures*, 634 A.2d at 334 (footnote omitted); *accord Milbank, [Tweed, Hadley & McCloy v. Boon]* 2d. Cir., 13 F.3d 537, 543 (1994) ("breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages"). The strict imposition of penalties under Delaware law are designed to discourage disloyalty.

The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relationship.

*Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510 (1939). Once disloyalty has been established, the standards evolved in *Oberly v. Kirby* and *Tri-Star* require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct.

Del.Supr., 676 A.2d at 445.

■ There is little dispute that the Corrados owed a fiduciary duty of loyalty

to WMI, as members of its Board of Directors, and to the other director-shareholders. *See* 1 *Drexler et al, Delaware Corporation Law and Practice* § 15.02 ("[D]irectors of corporations organized under Delaware law owe a fiduciary duty to the corporations upon whose boards they serve and to the stockholders of those corporations.") That duty of loyalty imposed obligations of disclosure on them when they sought WMI's approval of the License Amendment. *See Malone v. Brincat,* Del.Supr., 722 A.2d 5, 10 (1998) ("The duty of disclosure obligates directors to provide stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action."). The record before me amply demonstrates that the Corrados failed to make adequate disclosure of their personal interest in the Holdback in seeking WMI's approval of the Asset Sale and its consent to the License Amendment.

The question then is whether the Corrados must disgorge the Holdback to WMI or incur some other remedy for breach of fiduciary duty. Boyer argues that disgorgement is required, relying on the Supreme Court's decision in *Thorpe.* Alternatively, there is authority for awarding damages for a breach of the fiduciary duty of disclosure which is shown to be "concomitant with deprivation to stockholders' economic interests or impairment of their voting rights," *Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 147 (1997), or, as I find to be true here, where it has caused economic harm to the corporation. *Thorpe,* 676 A.2d at 445.

In *Thorpe,* the Supreme Court required disgorgement of a personal profit made by corporate directors as the result of their breach of fiduciary duty and also required them to reimburse the corporation for any expenses incurred by it as a result of their disloyal activity. The defendants were approached in their directorial capacities to discuss the possibility of a transaction between the corporation and a third-party.

In breach of their fiduciary duties of loyalty, the defendants diverted the corporate opportunity and, in the course of negotiations with the third-party, secured the payment of monies to themselves. Thus, the cause-and-effect relationship between the breach of duty and the personal profit was obvious.

That causal relationship is missing here between the creation of the Holdback and any breach of duty. The Holdback represented a portion of the ownership interest in DRPI sold to Sanifill in the June 1991 merger. The Corrados' interest in DRPI (and, thus in the Holdback) was unrelated to their positions as directors or stockholders of WMI. Thus, *Thorpe* does not support disgorgement of the entire Holdback as a remedy (or even the Corrados' one-half interest therein), as the Holdback was neither a product of a breach of fiduciary duty nor representative of a profit earned at WMI's expense.

The issue, as I see it, is more properly focused on whether WMI was injured by the Corrados' lack of candor in their efforts to secure the release of the Holdback. That is, if the Corrados had complied with their duty to disclose the existence and nature of their interest in the Holdback, is it likely that the WMI Board of Directors would have been able to negotiate to obtain some positive compensation for WMI in exchange for its consent to the License Amendment? This was the approach suggested by Boyer's August 1991 letter objecting to the Corrados' first proposal to move WMI, wherein he sought a cash payment in addition to indemnification of all moving expenses. It is also the approach one would expect to encounter in any arm's length negotiation between a corporate lease holder and a landlord seeking to terminate the lease prematurely, as few corporations would agree to suffer the inconvenience and risks attendant to a move of operations without some positive compensation.

How much added compensation WMI's directors might have negotiated is uncertain due to the fact that no such adequately informed, arm's length negotiation ever occurred. Boyer introduced evidence that the beneficial value of the leasehold was between $450,000 and $500,000 and, in his August 1991 letter, he demanded that the Corrados pay $200,000 as added compensation to each of the Stockholder Groups opposed to moving WMI's operation. In contrast, Iacono testified that he and Pettinaro discerned the fact that the Corrados had some interest but, nevertheless, were satisfied to move WMI's operation without any positive compensation. Iacono did testify that he was surprised by the large size of the Holdback when he first learned of it during the course of this litigation. Nevertheless, I am satisfied that he and Pettinaro, had they been properly informed, still would not have demanded as large a payment as Boyer or Boyer's expert suggested.

In the circumstances, our law's strong policy of discouraging acts of disloyalty and the fact that WMI ultimately consented to the License Amendment without any compensation require the imposition of some penalty to remedy the Corrados' act of disloyalty. *See Pike v. Commodore Motel Corp.*, Del.Ch., C.A. No. 940, 1986 WL 13007, Jacobs, V.C., mem. op. at 6 (Nov. 14, 1986) ("The prophylactic policy underlying these principles is that acts of conscious wrongdoing and breaches of a fiduciary's duty of loyalty will best be deterred by requiring the wrongdoer to disgorge any profit made as a result of such wrongful conduct."); *Ueltzhoffer v. Fox Fire Dev. Co.* (C.A. No. 9871) *and Drummond Builders, Inc.* (Cons.C.A. No. 9900), 1991 WL 271584, Del.Ch., Berger, V. C., mem. op. at 18 (Dec. 19, 1991) (finding director/stockholder in breach of fiduciary duty to other director/stockholders and requiring percentage of monies received by wrongdoing director/stockholder through abuse of control of corporation to be disgorged to victimized director/stockholders).

Considering all circumstances, I will assess damages for breach of the duty of loyalty in the amount of $150,000. I am satisfied that, had there been full disclosure of the Corrados' interest and arm's length bargaining among the parties, the owners of DRPI (i.e., the Corrados and their partners) would have been required to compensate WMI for its consent to the License Amendment. In part, I reach this conclusion because I am persuaded that the Corrados and their partners had a strong interest in getting the funds released from escrow. This interest was based both on their natural desire to secure possession of their money as quickly as possible and by the vague and uncertain terms of the escrow arrangements. It is reasonable to assume that the owners of DRPI would have agreed to pay 10% of the Holdback, in addition to relocation costs, to secure WMI's agreement to the License Amendment. Equally, I find it unlikely that a majority of WMI's directors would have required more.

### 3. Lost Stockholder Commissions

Boyer claims entitlement to damages for stockholder commissions lost between 1991 and 1994 as a result of the defendants having deprived him of his continuing participation in the captive hot mix operation. The Stockholders Agreement required a minimum shareholder purchase of 20,000 tons annually. If, Boyer contends, he purchased this minimum amount in each of these four years, he would have been entitled to an approximate total of $202,375 in stockholder commissions, based on his average annual commissions from 1987 through 1990. I find Boyer's claim too speculative to entitle him to relief for the alleged "lost" value of the commissions. As previously demonstrated, Boyer's business was insolvent as early as 1991 (although he did not declare bankruptcy until 1994) and the ability of his company to meet the 20,000 ton minimum

requirement is questionable.[22] I cannot award damages retrospectively for commissions of such a questionable and speculative nature.

### 4. Interest[23]

■ Boyer requests pre-judgment interest on any amounts awarded. Delaware law is settled that "[a] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Summa Corp. v. Trans World Airlines, Inc.,* Del.Supr., 540 A.2d 403, 409 (1988). Generally, the legal rate of interest has been used as "the benchmark for pre-judgment interest." *Id.* However, this Court "has broad discretion, subject to principles of fairness, in fixing the [interest] rate to be applied." *Id.* Based on the record before me, I see no reason why the legal rate of interest should not be applied.

■ As of January 14, 1992, the legal interest rate was 8.5% (5.0% plus the Federal Reserve Discount Rate of 3.5%.) I will award interest from January 14, 1992, the date that the WMI Board of Directors approved the Asset Sale and consented to the License Amendment. However, as it is conceded that there was no activity in this case for a period of approximately two years between 1994 and 1996, due to the bankruptcy of Boyer's business, I will shorten the period for computing interest by two years.

### C. Did Defendants Improperly Convert Boyer's Stockholder Loans?

■ The Stockholders Agreement, ¶ 4 required each Stockholder Group to contribute $25,000 as an interest free loan to WMI and to make such additional interest bearing loans as the Board of Directors determined. Under the terms of this provision, Boyer loaned WMI $25,000 as an initial working capital contribution and, over the years, loaned WMI $108,669 on an interest bearing basis. In connection with the Asset Sale and contemplated dissolution of WMI, the Board of Directors purported to convert all of these loans to common stock. Boyer makes a number of arguments why he should recover the amount of these loans from defendants.

I find that Boyer has been fully compensated for the value of his loans to WMI in my award of damages based on WMI's fair market value. As Dr. Puglisi testified, his opinion about value, on which I have substantially relied, was based on a "debt free" analysis of WMI's equity in which he treated the stockholder loans as equity. Thus, it would doubly compensate Boyer to award him separate damages for the value of those loans.

### D. Is Defendant J. Corrado Entitled to Be Indemnified by Boyer for Funds Paid to Mellon to Satisfy WMI Debt?

■ As mentioned in the Background section of this Opinion, see Part I.A.3., WMI's business capital was provided by working loans from Mellon, guaranteed by the shareholders through their affiliates. The proceeds of the Asset Sale left WMI with insufficient funds to meet its obligations, including its debts to Mellon. Ultimately, Corrado–American and Daisy contributed monies to WMI in order to pay off Mellon. Corrado–American's share is alleged to have been $121,000.

In his counterclaim against Boyer, J. Corrado seeks indemnification for these funds paid to Mellon by Corrado–American, contending that he is entitled to such indemnification pursuant to ¶ 10(b) of the Shareholders Agreement, which states:

> In the event that a creditor of the Company asserts a claim based upon a guaranty made by a Stockholder or affiliate ("Guarantor") as described in Subsection

---

**22.** *See supra,* pp. 888–89.

**23.** Boyer also seeks an award of attorneys fees, but states that he will apply separately for such an award after the matters addressed in this opinion are resolved. I will leave any issue regarding an award of fees for such later application.

(a) next above, each Stockholder shall and hereby does indemnify the Guarantor for all costs (including reasonable attorneys' fees), fees and expenses incurred in defending any such claim as well as any principal sums or interest recovered from the Guarantor; provided, however, that no Stockholder Group shall be required to contribute more than the amount of all losses suffered by the Guarantor multiplied by that Stockholder Group's percentage interest in the Company.

J. Corrado contends that Boyer is responsible for $30,250, or 25% of the amount allegedly paid by Corrado–American to Mellon.

This Court was first asked to make a finding in favor of J. Corrado on this issue on J. Corrado's cross-motion for summary judgment. Chancellor Allen denied the motion, finding that J. Corrado had not provided undisputed evidence tending to establish that "Mellon made demand upon Corrado–American and that Corrado–American in fact paid Mellon $121,000." *See Boyer*, Del.Ch., C.A. No. 12549, let. op. at 27.

At trial, J. Corrado failed to present evidence sufficient to establish that Mellon, as a creditor of WMI, asserted a claim against Corrado–American based upon the guaranty it made as the Corrados' affiliate. On direct examination he testified that Corrado–American and Daisy were called on to make payments as guarantors. However, J. Corrado did not produce any documentation of such a demand and Iacono did not corroborate this testimony.[24] Further, on cross-examination J. Corrado testified that he could not remember if a demand had been made to him personally and that he did not know if any documentation of Mellon's demand existed.

There is no dispute that Corrado–American paid money to WMI that was used in part to repay Mellon.[25] However, in the absence of documentation that this repayment was pursuant to a creditor's demand made by Mellon on Corrado–American as J. Corrado's shareholder affiliate and guarantor, the provisions of ¶ 10(b) of the Shareholders Agreement are not properly invoked. Therefore, I cannot find in favor of J. Corrado and dismiss the counterclaim.

## E. No Advice of Counsel Defense Is Available

▮▮▮▮ Iacono and Pettinaro argue that their "good faith reliance upon legal advice" provides a defense to them, citing 8 Del.C. § 141(e) and *Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., 663 A.2d 1134, 1142 (1994), *aff'd*, Del.Supr., 663 A.2d 1156 (1995). There is no dispute that Iacono and Pettinaro were both interested directors who gained by the sale of WMI's assets for less than fair value. In the circumstances, their reliance on the advice of Manning that the transaction was fair cannot shield them from liability to Boyer arising out of the unfairness of the transaction. I recognize that, in *Cinerama*, Chancellor Allen stated that "reasonable reliance on expert counsel is a pertinent factor in evaluating whether corporate directors have met a standard of fairness in their dealings with respect to corporate powers." Del.Ch., 663 A.2d at 1142. Indeed, in this case, had the defendants chosen independent counsel to represent the interests of WMI, reliance on the advice of such counsel would have weighed in the assessment of procedural fairness. They did not. And, while Iacono and Pettinaro may have operated under the mistaken impression that DM & H represented their

---

**24.** Iacono refuted this statement in his testimony, where he noted that Mellon "wanted [WMI's] line of credit paid off", and that Daisy Construction had fronted monies to pay this debt, but that Mellon had never made a demand, pursuant to his personal guarantee, against him. Tr. at 584.

**25.** The record reflects that such sums were repaid to Corrado–American and Daisy by WMI's successor corporation, Edgemoor Materials, Inc., in 1995 or 1996.

interests in connection with the transaction, they had no reason to believe that DM & H was representing WMI or its Board of Directors or had "been selected with reasonable care by or on behalf of the corporation." 8 Del.C. § 141(e). In the circumstances, the defense under Section 141(e) cannot be thought to be available.

### III. CONCLUSION

For all of the foregoing reasons, I find in favor of the plaintiff, R. Arnold Boyer, to the extent described herein, and award the relief set out in this opinion. Counsel for the parties are directed to confer and promptly submit an agreed upon form of order implementing this opinion or, if they are unable to agree, to submit proposed forms of order on notice.